HARRINGTON and others, Respondents, vs. PIER, Executrix, and others, Appellants.

*January 12 — February 2, 1900.*

*Wills: Equitable conversion: Bequests: Residuary estate: Charitable use: Cy pres doctrine: Perpetuities: Public and private trusts: Beneficiaries: Statute of uses and trusts: "Temperance work."*

1. Property, both real and personal,— the latter being much less than sufficient to pay the expenses of administering the estate, the funeral expenses, and debts of the deceased,— was willed as follows: Certain articles named to specified persons; the real estate to be converted into money; three fourths of the net estate left after payment of the debts and expenses mentioned to be paid to named trustees to be expended in their discretion in temperance work in the city of Milwaukee, the greater part for the benefit of two temperance organizations in said city, but in case of either organization deciding to erect a building, the whole fund then remaining to be used for that purpose, and in any event the entire fund to be expended within five years from its receipt by the trustees; all the rest, residue, and remainder of the estate to certain persons named. *Held:*

(1) The positive direction to reduce the real estate to money for all the purposes of the will, by equitable conversion, accomplished that result from the time the will took effect.

(2) Where a will directs the conversion of realty into personalty for a particular but void purpose, the doctrine of equitable conversion does not not apply; but unless otherwise clearly indicated by such will, such realty will pass to the heirs as property undisposed of thereby.

(3) If, notwithstanding the failure of a purpose requiring a conversion of realty into personalty to satisfy it, the intention is manifest to accomplish a distribution of the estate in the form of money, that intent will accomplish the conversion of the realty into personalty in equity; and unless otherwise clearly indicated a void bequest will fall into the residuum and go to the residuary legatee if there be such.

(4) The blending of real and personal property in one fund for all purposes of a will strongly evidences an intent that the whole estate shall at all events be distributed as personal property.

(5) If the residue of an estate be divided by the terms of the will, and a part, as such, be willed to one person, and a part, as such, to

Harrington and others vs. Pier and others.

another, and the will be void as to one, the portion that would otherwise go that way will not swell the portion going the other, but will pass to the heirs as property undisposed of by the will in the absence of a clear intent to the contrary.

(6) The rule last mentioned does not apply where there is a bequest of a specific part of the net estate to one person and all the rest and residue of the estate is bequeathed by a residuary clause in general language, unless a clear intent to the contrary be manifest by the will.

2. The bequest of three fourths of the net estate to trustees to expend in temperance work in the city of Milwaukee is a valid bequest for a charitable use, and that rests on the following principles:

(1) The common-law system of trusts for charitable uses did not originate with, nor is it dependent upon, the statute of 43 Eliz. ch. 4.

(2) A trust for a particular and valid charitable purpose, as distinguished from a bequest in trust for charity generally, was sustainable in chancery before the statute of Elizabeth solely by the judicial power of the court, and to that extent such statute was merely confirmatory of the common law; and to the same extent such statute was adopted as a part of the common law of this country and prevails in this state.

(3) In sustaining a trust of the character last above indicated, courts of equity resort to liberal rules of construction to determine the intent of the donor, enabling them to go to the limit of the general purpose indicated by the donor and do everything necessary to enforce such purpose, but not to go outside of it into the realms of prerogative authority governed by the *cy pres* doctrine strictly so called.

(4) The *cy pres* doctrine, as indicative of prerogative authority, does not prevail in this state, but as regards liberal rules of construction of charitable trusts, applied in chancery in England independent of the statute of Elizabeth, it does prevail.

(5) *Cy pres* power, as commonly understood, has two features: one, the right to exercise prerogative authority, enabling a court to deal with a bequest to a charitable use having no designated particular purpose as a bequest to charity generally, treating the purpose as the legatee, or a bequest for an illegal purpose, or some purpose impossible of execution for some reason; and the other, the right, by liberal rules of construction, to deal with a trust having a designated particular purpose, though in general terms, and enforce it within the limits of such purpose, supplying the trustee if necessary. The former is not exercised here, but the latter is.

Harrington and others vs. Pier and others.

(6) The statutes of perpetuities and of uses and trusts do not apply to bequests for charitable uses. Whether they do to devises to such uses, not here decided.

(7) Indefiniteness of beneficiaries is one of the characteristics of a trust for charitable uses. Without it the trust is private. Neither such indefiniteness, nor indefiniteness as to the precise nature of the work to be done, or the mode of execution in carrying out a particular purpose which may be indicated in general language, militates against the validity of the trust.

(8) The idea that there must be certainty of beneficiaries holding the equitable title, who can come into court and enforce the trust, applies to private but not to public trusts, and has no place in a system of charities where common-law trusts therefor, sustainable without the aid of *cy pres* authority, are valid. Such a system, as to personal property at least, exists in this state.

(9) Necessary certainty as to beneficiaries in a public trust goes no further than reasonable certainty as to the class, which may be great or small, particular or general, from which the trustee may be authorized to select the immediate persons or objects to receive the special benefits.

(10) The statute of uses and trusts furnishes no standard by which to test the sufficiency as to certainty of a public trust. It refers solely to private trusts.

(11) The doctrine that the scheme of a trust for charitable uses must be sufficiently indicated, or the method of ascertaining it pointed out and its object made sufficiently certain to enable the court to enforce the execution of the trust accordingly, does not refer to the essentials of a private trust, indicated in the statute of uses and trusts, but to the common-law essentials of a trust for charitable uses, in order to be enforceable by a court of equity through its judicial power.

(12) The New York doctrine as to the effect of statutes of perpetuities and uses and trusts upon trusts for charitable uses, does not prevail in this state as to personal property. Whether it does as to real estate, not decided.

(13) *Dodge v. Williams*, 46 Wis. 70, and *Gould v. Taylor Orphan Asylum*, 46 Wis. 106, approved and followed. Cases prior and subsequent thereto in this court, reviewed, distinguished, and harmonized therewith; except *Fuller's Will*, 75 Wis. 431, which is disapproved.

(14) Any work within the spirit, in its broadest sense, of the statute of 43 Eliz. ch. 4, including whatever promotes in a legitimate way the comfort, improvement, or happiness of an indefinite num-

ber of persons from among the people as a whole, or a designated class thereof, is the proper subject for a trust for a charitable use.

(15) The promotion of temperance work in a certain city is a proper subject for a charitable trust, and is not fatally indefinite where the term "temperance work" is obviously intended to mean work to prevent, as far as practicable, the use of intoxicating liquors.

CASSODAY, C. J., dissents.

[Syllabus by MARSHALL, J.]

APPEALS from a judgment of the circuit court for Milwaukee county: D. H. JOHNSON, Circuit Judge. *Reversed.*

The last will and testament of Elizabeth Ann Sutton was duly admitted to probate in the county court of Milwaukee county. An appeal was taken, from the order of such court allowing the will, to the circuit court, where such order was affirmed, and no appeal has been taken therefrom. This action was brought to obtain a construction of the will. The will contains the following bequests, directions, and expressions of the testatrix's wishes:

(1) Bequest to Mary S. McCord, a sister, the testatrix's wearing apparel.

(2) Bequest to Mary S. McCord, and to Herbert Parker, a brother, in equal shares, the household goods and furniture.

(3) Direction to the executrix to convert the real estate into money.

(4) Direction to the executrix, after payment of the debts of the testatrix, funeral expenses, and expenses of administering the estate, to pay three fourths of the net proceeds of the estate to *John E. Clayton* and *Eden W. Drake*, of the city of Milwaukee, as trustees, to be by them or the survivor of them expended for temperance work in said city of Milwaukee as their best judgment shall dictate, the greater portion of the fund to be used for the benefit of Crystal Spring Lodge, I. O. G. T., and the Woman's Christian Temperance Union of said city of Milwaukee, and in case of either of said organizations deciding to erect a building for temper-

ance work in said city of Milwaukee, to use the whole of the trust funds then remaining, in the erection and construction of said building; all of the funds to be expended in temperance work within five years from the time the same shall come to the hands of the trustees.

(5) Bequest of the rest, residue, and remainder of the estate to *George Henry Andrews* and *William Andrews* in equal shares.

The trial court decided, upon evidence, that the property consisted of household furniture and wearing apparel valued at $150, cash to the amount of $11.15, and real estate to the value of about $7,000; that there were debts to the amount of about $538; that the only heir was Sarah Parker, who died subsequent to the death of the testatrix, leaving as her sole heirs certain persons named who are parties to this action; that the Woman's Christian Temperance Union, and the Crystal Spring Lodge, Independent Order of Good Templars, mentioned in the will, are corporations; that the direction in the will requiring a conversion of the real estate into money was made for the sole purpose of carrying out the trust provisions of the will; that such trust provisions are void for uncertainty; and that the three fourths of the testatrix's property, bequeathed to trustees for the promotion of temperance, descended to the heir, Sarah Parker, as undisposed of property, and that the heirs of Sarah Parker are entitled to the same. Judgment was rendered accordingly. The executrix of the will and the trustees appealed from the whole judgment. The residuary legatees appealed from that part of the judgment which was adverse to them.

For the appellants there was a brief by *Nickerson, Roemer & Aarons*, attorneys, for *G. H.* and *W. Andrews*, a separate brief signed by *Fish, Cary, Upham & Black*, attorneys for the trustees, and *E. G. Comstock*, attorney for the executrix; and oral argument by *A. L. Cary* and *H. W. Nickerson*.

For the respondents there was a brief by *Toohey & Gilmore*, and oral argument by *John Toohey*.

---

---

MARSHALL, J    The vital question presented for adjudication on this appeal is, Is the bequest to trustees to promote temperance work in the city of Milwaukee void for uncertainty?  That involves the consideration of several cases where the important questions involved have been decided by this court, but without such a strict adherence to a definite judicial policy in each case and reasons given for the conclusions reached that it can be said, even at this late day, that we have an established system, based on entire harmony of judicial decisions, by which trusts for charitable purposes can be tested when their validity is challenged.   The importance, always recognized, of protecting the individual right of every person to devote his private fortune to the public good so far as practicable without the violation of any legal principle, and of making all efforts to that end effective to accomplish the donor's purpose, cannot be overestimated.  Few things occur in the administration of justice more lamentable than the occasional strangling of some wise and noble purpose to devote the savings, or part of them, of a life of industry, to the upbuilding of the human race at some point or in some field, and the diversion of what was intended for some public benefit to private use, directly contrary to the will of him whose last days were solaced with the thought that his public benefactions would build an enduring monument to his memory in the hearts of grateful people, and the hope of eternal rewards for such well-doing believed to be waiting for bestowal.   That idea prevailed with the fathers of the common law so far back that neither the memory of man nor judicial records run to the contrary.  It became crystallized as a part of the common law of England long prior to the statute of 43 Eliz. ch. 4, to the effect that gifts to charitable uses should be highly favored and construed by the most liberal judicial rules that the nature of each case, as presented, would admit of, rather than that the gift should fail, and the intent of the donor fail of accomplishment.  The judicial system in regard to such gifts was transplanted to

and became a part of the common law of this country and it has been so judicially declared in all or nearly all the states, barring the effect upon it of the statute of Elizabeth, except in states where, by statute, such system has been modified or abrogated.   Just where this state stands on the question, as before indicated, cannot be stated and the statement supported with that entire harmony of adjudications which should be sought for on a branch of the law of such importance.   If that difficulty can be met and existing obscurities cleared up, so far as they affect the case before us, and a conclusion be reached as the result of an established harmonious judicial system entirely consistent in all its parts, this decision will have a significance far beyond the mere fact of justice done in the particular case.

The doctrine of equitable conversion is of importance on both appeals, but more particularly on the appeal of the residuary legatees.   It is deemed best to take up that subject at this point, and it will result in disposing of the appeal of the residuary legatees first.

The will requires the executrix to convert the real property of the testatrix into money and to distribute the entire estate as personal property in the manner indicated therein. In the absence of any circumstances sufficient to do away with the force of that direction, it worked an equitable conversion of the testatrix's real property into personalty, and required the will and every part of it to be treated as if dealing with property of the latter character in law and in effect, as of the death of the testatrix.   The rule is that where there is a positive direction in a will to convert the real property into personalty, or there is a power of sale in a will and bequests of such a character as to plainly indicate a testamentary intent that such power shall be executed to provide the means of satisfying them, or where the provisions of a will cannot be carried out without converting the realty into personalty, and the conditions are such that the testator

must have contemplated that such conversion would take place to that end, courts of equity deal with the estate as personal property from the time the will takes effect,—from the death of the testator. *Chandler's Appeal*, 34 Wis. 505; *Dodge v. Williams*, 46 Wis. 70; *Milwaukee Protestant Home v. Becher*, 87 Wis. 409; *Hunt's Appeals*, 105 Pa. St. 128; *Given v. Hilton*, 95 U. S. 591; *King v. Woodhull*, 3 Edw. Ch. 79; Rice, Real Prop. 32; 3 Redf. Wills, 141; Roper, Legacies (1st Am. ed.), 341. True, a general direction to sell all the real property for some one or more purposes named in a will does not always work a conversion thereof into personalty where a necessity therefor does not exist and there is not a clear intent that at all events the testator's purpose was to distribute his estate as personal property. If it appear that the direction to convert the realty into money was coupled with and to merely effect some particular purpose susceptible of satisfaction by a sale of part of the realty only, or if the bequest for such purpose be void, and the will evidences that the execution of the power of sale was made dependent upon the purpose to be accomplished, the application of the doctrine of equitable conversion of realty into personalty ends where the absence of necessity for it begins. The mere circumstance, however, that bequests can be satisfied without a full execution of the power of sale, or be coupled with invalid bequests, is not so inconsistent with an intent that the whole estate shall be treated as personal property as to preclude the application of the doctrine of equitable conversion in such circumstances, if that be manifestly necessary to effect the testator's intent gathered from the entire will. As said in *Given v. Hilton, supra,* the blending of real estate and personal property in one fund for all the purposes of the will is generally regarded as evidencing intent that the whole estate shall be treated as personal property even though a necessity therefor does not exist, but such evidence is not conclusive on the question. The court, in

all cases where there is any obscurity, either in the literal
sense of the language of the will or the application of such
language to the facts, must resort to familiar rules for the
judicial construction of such instruments, and when the real
thought of the testator, in mind when he made the will, shall
have been discovered with clearness, if within the reasonable
meaning of the language used to express it, such thought
must be held to have impressed the property, of which the
testator died seised or possessed, with a character consistent
therewith.

The doctrine of equitable conversion, as above stated, is
elementary. It has often been applied by this court, partic-
ularly in the class of cases to which this belongs, one of the
most significant instances being in *Dodge v. Williams;* 46
Wis. 70. The application of it to the will in question, if the
bequest to promote temperance be valid, is not contested on
either appeal. Such application, in the event stated, is of
importance on the theory that the statute of uses and
trusts and the prohibition of perpetuities in real estate ap-
ply to gifts of real property for charitable uses, but not to
personal property. Such theory has much support in decis-
ions of this court. It has been rather taken for granted
than directly decided, since *Dodge v. Williams.* Whether
such is the settled law, so as not to be open for discussion,
need not be decided in this case. Where a question, affect-
ing property rights, has been judicially settled so long as to
have become a rule of property, for the courts to disturb it,
even if settled wrong at the start, would be a greater wrong
than the original mistake; and in such circumstances the
maxim, *Stare decisis, et non quieta movere,* should be pretty
rigorously applied. For the purposes of the bequest in con-
troversy there can be no question but that the entire estate
must be dealt with as personal property, and, as we shall
show, as to such property at least, it was plainly and cor-
rectly decided in *Dodge v. Williams* that the statutes of

perpetuities and of uses and trusts have no application to gifts for charitable purposes. That was as far as the court was called upon to go on the facts in that case. The same is true now. It may be easily gathered from the language of the learned chief justice who wrote the opinion in *Dodge v. Williams*, that there was considerable doubt on the question as to whether the rule, declared as to personal property, should not be extended to real estate. He showed to a demonstration that the English doctrine of perpetuities was not applied in the place of its origin to public trusts and that if it is so applied here it must be by force of the statute. That such is the rule in most jurisdictions where there is a statute declaratory of the common law, or where the common-law doctrine prevails in this country, will be easily discovered by a review of the authorities outside of this state. *Yard's Appeal*, 64 Pa. St. 95; *Philadelphia v. Girard's Heirs*, 45 Pa. St. 1; Lewis, Perpetuities, 689; *Richmond v. Davis*, 103 Ind. 449; *Perin v. Carey*, 24 How. 465; Perry, Trusts, §§ 384, 687, 736; 5 Am. & Eng. Ency. of Law (2d ed.), 902, and cases cited, among which will be found *Dodge v. Williams, supra*, and *Gould v. Taylor Orphan Asylum*, 46 Wis. 106. Those two cases are out of harmony, as will be seen later, with some things said in *Ruth v. Oberbrunner*, 40 Wis. 238, and *Heiss v. Murphey*, 40 Wis. 276; and it will also be seen that whatever conflict there is in subsequent decisions results from the influence of *Dodge v. Williams* prevailing at one time, and *Heiss v. Murphey* and *Ruth v. Oberbrunner* at another. It is not intended at this time to commit the court, in any degree, on the subject of whether the rule in *Dodge v. Williams*, as to the statute of uses and trusts not affecting testamentary gifts of personal property for charitable uses, applies to such gifts of real estate. The subject is simply referred to in order that the decision in this case, on the subject of the validity of the trust in controversy, shall not be considered as inferentially decid-

ing that the trust would be valid if the subject of it were real property instead of personal property. Some return to this subject will be necessary later in this opinion.

On the appeal of the residuary legatees, the question of whether the decision of the trial court, that the direction to convert the real estate into money is dependent upon the validity of the bequest for temperance, is of vital importance as bearing on the question of whether the property, intended to be used to satisfy the void bequest, if there be such, goes to the residuary legatees or passes to the heirs of Sarah Parker, the only heir of the testatrix at the time of her death, as property undisposed of by the will. The trial court took the latter view, and of that the residuary legatees complain, and by their appeal present the controversy in that regard for decision.

The will plainly directs the conversion of all the testatrix's property into money and the distribution of it as such. There is a "blending of realty and personalty," mentioned in *Given v. Hilton*, 95 U. S. 591, as circumstantial evidence of an intent to distribute the entire estate in the form of money. Following the direction to sell the realty and the direction to pay the debts and funeral expenses and expenses. of administration, is a direction in regard to the distribution of the net proceeds; all indicating, pretty clearly, that the previous directions were to be satisfied out of the testatrix's. property generally, after the conversion of it into money. Again, the will provides for a division of the net proceeds, and that a part, on such division, shall go to the residuary legatees mentioned, indicating that such legatees shall take the property only in the form of money. Moreover, as suggested, the debts, funeral expenses, and expenses of administration, which the testatrix must have had in contemplation, were several times more than the personal property, and. were directed to be paid out of the proceeds of the property generally. Looking at the will, as a whole, and applying it.

to the facts, we cannot discover any reasonable ground for saying that the testatrix directed the conversion of her property into money for the sole purpose of the gift in trust for temperance work. The entire scheme of the will shows that she intended to dispose of all her property thereby, and that it should be dealt with solely in the form of money. The decision in *McHugh v. McCole*, 97 Wis. 166, cited to our attention, does not apply. The evident purpose of the will there was that it should be executed in money as to certain bequests, held by the court to be invalid, and that the residue should go to the beneficiaries named *in specie*, whether in the form of personal property or realty. Neither does *Read v. Williams*, 125 N. Y. 571, apply. The distinction between such cases and the one before us is clearly marked. In the *Read Case* it was evident that the direction to convert the real estate into money was not made for the purpose of the distribution of the estate, but in aid of a particular purpose named, which failed. The rule was there stated, referred to in *McHugh v. McCole* as elementary, that the power of sale in a will, however peremptory in form, if it can be seen that it was inserted in aid of a particular purpose of the testator, or to accomplish his general scheme of distribution, does not operate as a conversion where the scheme or purpose fails, by reason of illegality, lapse, or other cause. Here, the general scheme of the testatrix was to distribute her estate as personal property. That has not failed. The direction to convert the entire estate into money was not merely in aid of, or merely to accomplish, a particular purpose named, but for all the purposes of the testatrix's scheme, no one of which can be carried out according to the manifest intent unless the conversion directed takes place.

True, when a testamentary purpose, intended to be carried out by the conversion of real estate into personalty, fails for invalidity or other cause, the doctrine of equitable conversion does not apply, unless a clear intention can be

collected from the will that the division of the property shall be made in money at all events. We cannot escape, however, the conclusion that such was the testatrix's intent. There is no other reasonable explanation, to our minds, in view of the condition of the estate, of the fact that the will contemplated the blending of real and personal property for every purpose mentioned in it,— the payment of debts, expenses of administration, and funeral expenses, as well as the final division of the net proceeds.

The doctrine is invoked on the appeal of the residuary legatees that, " where a devise, otherwise valid, is inseparably coupled with a void devise and is a mere accessory thereto, and the amount of the valid part cannot be ascertained, then both must fall together." We cannot discover any reasonable application of that to this case. The bequest to the residuary legatees is not inseparably connected with the gift to promote temperance, neither is it an accessory to or dependent upon the other in any way. Under such circumstances, by the most familiar rules governing the subject, the failure of one part of a will for invalidity or other cause does not affect those portions of it otherwise valid.

Having concluded that the entire estate, irrespective of the validity of the bequest to promote the cause of temperance, must be dealt with as personal property, and that, independent of whether the particular bequest mentioned be preserved, the rest of the will must stand, little is left to be considered on this branch of the case. There is no contention but that, generally, void legacies fall into the residuum of the estate and go to the residuary legatees. The only exception is where there is a clear intent manifested by the will to the contrary. The mere fact of making a will is so inconsistent with any other intent than that to provide for a disposition of all the property of the testator, that very strong and clear language is required to show a contrary intent. For that reason a residuary bequest in general terms

is held to carry void and lapsed legacies.  The only circum-
stance claimed in this case to rebut the legal presumption
that the testatrix intended that lapsed legacies should pass
under the residuary clause of the will, is the circumstance
that a specific part of the net proceeds of the property, left
after the satisfaction of such claims as would be necessarily
preferred without any mention of them, was bequeathed to
the residuary legatees, the other portion being bequeathed
to trustees.  It is said that the net proceeds, so directed to
be divided, constitute in fact the residuum of the estate, and
that it was divided, a part being bequeathed to such legatees
and a part in trust for temperance work, and that under such
circumstances the rule mentioned does not apply.  True,
when a portion of an estate is plainly treated as the resid-
uum, and as such is divided and the several parts separately
bequeathed, the failure of one part does not go to increase
the amount of the others.  *Floyd v. Carow*, 88 N. Y. 560;
*Booth v. Baptist Church*, 126 N. Y. 215.  But we fail to see
any clear application of that to the will before us.  The tes-
tatrix did not bequeath three fourths of her net estate in
one direction and one fourth of it in another, treating the
net estate as the residue.  She bequeathed three fourths
of the net estate in one direction, and "all the rest, residue
and remainder to *George Henry Andrews* and *William An-
drews*, to be divided between them equally, share and share
alike."  The term "residue" was used with reference to
what might be left of the estate after satisfying the previ-
ously declared purposes.  The amount of the residuum was
not necessarily one fourth of the net estate, so called.  The
testatrix must be presumed to have had in mind, in view of
the general language of the residuary clause, that all of her
estate that for any reason might not pass under the particu-
lar bequests would go to the residuary legatees under the
general language of the residuary clause.  That is manifest
from the whole will.  If the testatrix intended to treat the

Harrington and others vs. Pier and others.

net proceeds of her estate as the residue, she would have so indicated by in terms bequeathing three fourths of it to the trustees for temperance work and one fourth of it to the nephews mentioned, instead of using the ordinary language generally held by courts to indicate an intent that the residuary legatees are intended to take all property subject to be bequeathed by her, not otherwise effectually disposed of.

We will now take up the subject referred to in the opening lines of this opinion. Is the bequest void for uncertainty, of three fourths of the net estate, to trustees to be used or expended by them, or the survivor of them, as their best judgment shall dictate, in temperance work in the city of Milwaukee, the greater portion to be used for the benefit. of Crystal Spring Lodge, I. O. G. T., and the Woman's Christian Temperance Union of said city of Milwaukee, but if either of said organizations decide to erect a building for temperance work in said city of Milwaukee, the whole trust fund then remaining in the hands of the trustees to be used by them in the erection and construction of such building, all of such trust funds to be expended in temperance work within five years from the time of coming into the hands of the trustees?

The precise nature of the uncertainty discovered by the trial court does not appear from the record; but from the arguments of counsel in support of the judgment we assume the case was supposed to be ruled. by *Ruth v. Oberbrunner*, 40 Wis. 238, and *Heiss v. Murphey*, 40 Wis. 276, and other cases in this court and expressions in opinions which follow the *Ruth* and *Heiss Cases*, to the effect that the statute of uses and trusts, and the inability of courts of equity to exercise *cy pres* power, place trusts for charitable uses on the same basis as private trusts, so that a trust of the former character, not sufficiently definite both as to the charitable scheme and the beneficiaries that it can be enforced by the courts after the manner of private trusts, is void for uncer-

tainty; that subd. 5, sec. 2081, Stats. 1898, applies, rendering a charitable trust void unless "fully expressed and clearly defined upon the face of the instrument creating it." That was the New York rule when the cases mentioned were decided and until recently changed by statute, and it was fully sanctioned by this court in such cases. The published syllabus of *Ruth v. Oberbrunner* correctly states, in substance, what was said in the opinion. It is as follows: "Sec. 1, ch. 84, R. S. 1858, abolishes all trusts, including those for charitable purposes, except such as are specifically authorized by that chapter." The view which courts elsewhere have drawn from the two cases mentioned is well illustrated by what was said by the supreme court of Illinois in the recent case of *Hoeffer v. Clogan*, 171 Ill. 462, commenting on the recent case in this court of *McHugh v. McCole*, 97 Wis. 166, which follows closely the reasoning and points decided in the *Ruth* and *Heiss Cases* and the New York authorities relied on therein. The following is the view of the Illinois court: "In Wisconsin all trusts are abolished by statute, except certain specific trusts where there is certainty in the beneficiaries." "The doctrine of charitable uses is not in force." "A trust, to be sustained, must be of a clear and definite nature, and the beneficiary interest to every person therein must be fully expressed and clearly defined upon the face of the instrument." If such is the law of this state, it will not be seriously contended that the bequest in controversy will stand the test and can be preserved, especially as to certainty of beneficiaries, as in case of a private trust.

It is not supposed that a treatment, to any great extent, of the underlying principles of the system upon which this case must stand or fall, is necessary. The time has gone by when long discussions of questions touching the origin of trusts for charitable uses as distinguished from private trusts, the jurisdiction of courts of equity over the former, how

they are affected by the statute of 43 Eliz. ch. 4, whether
the common-law system of charities and the jurisdiction of
equity over them is based on that statute or is independent
of it, whether without adopting the English statute we in-
herited its system of trusts for charitable uses divorced from
the *cy pres* feature of such statute, the true nature of the *cy
pres* doctrine as to whether it means more than the admin-
istrative features of such statute, or the exercise of prerog-
ative power strictly so called, and the multitude of other
questions that might be mentioned, are necessary or proper.
The books are full of judicial discussions of all these ques-
tions by persons showing great learning and depth of re-
search into the subjects.   Such subjects have all been so
thoroughly settled that we need only refer to conclusions,
and harmonize them, so far as practicable, with the adjudged
cases in this court, and after blazing out a line clearly by
the light of such cases and conclusions, determine how the
case before us stands in regard to it.

In *Dodge v. Williams*, 46 Wis. 70, and *Gould v. Taylor
Orphan Asylum*, 46 Wis. 106, the cases being represented
by eminent counsel on both sides and considered and de-
cided together, they having been so arranged because of the
great importance of the questions involved, the decisions in
*Ruth v. Oberbrunner*, 40 Wis. 238, and *Heiss v. Murphey*, 40
Wis. 276, were pressed upon the attention of the court, to
the effect that no trust is valid under the laws of this state,
whether charitable or otherwise and whether of real or per-
sonal property, unless so created as to satisfy the statutory
rule of definiteness laid down in the statute of uses and trusts,
at sec. 2081, Stats. 1898, and the requirements, generally, of
such statute.   A reference to the briefs of counsel support-
ing that theory shows that they grounded their arguments
on the idea that the doctrine of charitable uses does not ob-
tain to any extent in this state; that a trust not having all
the elements of certainty requisite to a private trust cannot be

sustained without the aid of the *cy pres* doctrine; that a court of equity cannot exercise any authority over a donation to charitable uses that it cannot in case of a private trust, except by virtue of the prerogative power of the sovereign, the so-called *cy pres* power, and that courts of this state possess no such power. On the other hand, it was contended that the legislature did not intend to abolish the common-law system of trusts for charitable uses, and that they still are lawful and sustainable except where so indefinite as to be incapable of enforcement by the court without the aid of the *cy pres* doctrine, strictly so called, limited to the power, where property is given for charitable purposes generally,— given with no declaration of the particular purposes to which it is to be applied or any declaration of a purpose that can be carried out,— to ascertain and determine a purpose within the general scope of the donor's intention, or akin to it, and to frame a scheme to effect such purpose and to enforce the execution of such scheme through the medium of a remedy analogous to that given by the statute of Elizabeth on the subject; that the legislative intent was to preserve charitable uses and trusts in all their essential and distinctive features, so far as they are sustainable independent of the *cy pres* remedy of such statute, or the exercise of prerogative power strictly so called. The two positions so taken before the court were so inconsistent with each other, the one being based on *Ruth v. Oberbrunner* and *Heiss v. Murphey* and the other opposed to the general doctrine of those cases, not necessarily the decisions rendered, that no middle ground was left on which to harmonize. If one theory was right the other was necessarily wrong. The subject of the trust was personal property. The trustees named were trustees of several colleges. The uses and purposes declared were payment for the education and tuition of worthy indigent females at such colleges, and, in a particular contingency, for the education, tuition, and support

of worthy indigent young men attending and studying for the ministry at one of the colleges named. There was a further bequest, on a specified contingency, to a corporation to be organized to take and administer it as a trustee, as to which the use and purpose declared was the education of worthy indigent females in the manner commonly done at female seminaries. It will be noted that neither of the trusts could well be enforced after the manner of private trusts. There was an entire absence of certainty of beneficiaries who could invoke judicial power to enforce the trust. The broadest discretion was left to the trustees to select the immediate beneficiaries from a class having no limitation as to residence or location, and none as to number, kind, or character, except by the indefinite term, "worthy indigent females," or "worthy indigent young men studying for the ministry." The method of carrying out the declared purpose had no limitation except that of the work done at the several schools named.

The opinion in the case was written by Chief Justice Ryan, who took no part in the first of the former cases, and who appears to have concurred in *Heiss v. Murphey* because of the absence of any trust, the bequest being made directly to uncertain and unascertainable devisees. The court, as indicated in the opinion, in terms or in effect, decided as follows: Bequests of personal property to charitable purposes, good by the rules of the common law, except so far as affected by the *cy pres* remedy and doctrine of the statute of 43 Eliz. ch. 4, are good under the laws of this state. When it is said that the doctrine of *cy pres* does not prevail in this state, that does not refer to those liberal rules of judicial construction of charitable trusts, by courts of equity, which prior to the statute of Elizabeth were applied in chancery, and of which such statute is only confirmatory, but to the prerogative power exercisable where such statute prevails. Courts here, as anciently, look with favor

upon all donations to charitable uses, and give effect to them where it is possible to do so consistent with rules of law, and to that end the most liberal rules the nature of the case will admit of, within the limits of ordinary chancery jurisdiction, will be resorted to if necessary. It is sufficient if there be a trust and a particular charitable purpose, as distinguished from a gift to charity generally. The court may supply the trustee to administer the trust; the trustee may select the beneficiaries from within the general class named by the donor, and when necessary may work out the details of the declared purpose within its stated general limits. Certainty of beneficiaries who can invoke judicial power to enforce the trust is not only unnecessary, but is inconsistent with the very nature of a trust for charitable uses, in that the beneficiaries, in a general sense, are the members of the public at large. A public charity, within the rule mentioned, is sufficiently definite as to purpose if its general nature be clearly stated, or it can be made otherwise certain by the trustees clothed with the power of administering the trust within the limits of the declared purpose. It is sufficiently definite as to immediate beneficiaries, by the power of selection lodged expressly or impliedly in the trustee appointed by the donor, or by the court where there is a trust but no trustee. If the trustee abuse his power, there is a complete remedy by the exercise of the visitorial power of the state. The statute of uses and trusts, as to personal property at least, does not apply to trusts for charitable uses. The New York doctrine and decisions on that question have no force here. For greater certainty as to what is here said, we quote: "Public charities, indefinite in terms, are necessarily limited in their administration by the amount of the foundation. Where the founder does not provide a rule or order of selection, there is, therefore, in every public charity, a necessary power of selection of beneficiaries in the trustee. If the power is abused, the state,

in the exercise of its visitorial power, will correct it."
"When a trust defines the beneficiaries with certainty, it is
rather private than public. As Mr. Perry remarks, charity
begins where uncertainty of the beneficiaries begins. Perry,
Trusts, § 687. 'It is the number and indefiniteness of
the objects, and not the mode of relieving them, which is
the essential element of a charity. . . . A good chari-
table use is public, not in the sense that it must be executed
openly and in public; but in the sense of being so general
and indefinite in its objects as to be deemed of common and
public benefit.'" *Dodge v. Williams*, 46 Wis. 97, 98. "'The
rule of public policy which forbids estates to be indefinitely
inalienable in the hands of individuals does not apply to
charities.'" "It is almost sufficient to say, for the pur-
poses of this case, that the statutes of uses and trusts and
against perpetuities are expressly limited to realty." 46
Wis. 95.

In view of the foregoing, that *Dodge v. Williams* was ruled
by an entirely different doctrine than *Ruth v. Oberbrunner*,
40 Wis. 238, as to personal property at least, without deter-
mining whether the doctrine of the former should be ex-
tended to realty, hardly admits of reasonable controversy.
The theory of the former case is that trusts for charitable
uses must have all the essentials of certainty, of private
trusts; that of the latter case is that trusts for charitable
uses, good by the rules of the common law, except as added
to by the *cy pres* doctrine of the statute of Elizabeth, are
good here, at least as to personal property. The case was
distinguished from *Ruth v. Oberbrunner* in that in the latter
the subject of the trust was real estate and the trust was
private. It was distinguished from *Heiss v. Murphey* in that
in the latter case the donees were uncertain and unascertain-
able. The reasoning of the early cases, inconsistent with
that of the later case, was treated as *obiter*, and in that way
the reasoning and decision in the latter easily harmonized

with the decisions in the former. Nothing actually previ-
ously decided was necessarily or in fact overruled.

From the foregoing it would seem that when we have de-
termined whether the reasoning which led to the decision
in *Dodge v. Williams* and such decision, or the reasoning
which led to the decision in *Ruth v. Oberbrunner*, is to pre-
vail as the law of this state, we shall have pretty nearly de-
cided the vital question before us.

*Gould v. Taylor Orphan Asylum,* 46 Wis. 106, decided
with *Dodge v. Williams,* need not be commented upon to any
great extent. The justice who delivered the opinion deliv-
ered those in the two earlier cases, and followed the lines of
the opinion of the chief justice in the accompanying case.
The bequest was to trustees for the care of orphan children
of Racine county, and such other poor, neglected, and neces-
sitous children as the managers might decide to receive.
The formation of a corporation to receive the fund and ad-
minister it was contemplated but not made imperative. It
was decided that the fund, without a corporate organization,
could be permanently retained and administered by trustees
for the charitable work contemplated by the donor. That,
it will be observed, is the common-law doctrine of charitable
trusts. The court said, in effect, if any or all of the trustees
should refuse to act, or fail from any cause, the court of
equity would have undoubted equitable jurisdiction to sup-
ply trustees, indefinitely, and support the trust and give
effect to the charitable use declared by the donor. The idea,
it will be observed, was that certain beneficiaries vested with
an equitable title corresponding to the legal title held by the
trustees, who could come into court and enforce the trust
after the manner of private trusts, were not deemed neces-
sary.

A review of cases touching the subject under discussion
would not be complete if an idea thrown out in *De Wolf v.
Lawson,* 61 Wis. 469, were passed without notice.

In *Dodge v. Williams*, 46 Wis. 70, on the subject of whether the law against perpetuities was important on the facts of that case, after suggesting that it was probably sufficient to support the negative, that both the statute of perpetuities and of uses and trusts are expressly limited to real estate, and referring, in effect, to the statutes as but re-enactments of common-law principles, Chief Justice RYAN said: " But were this otherwise, the statute limiting the rule against perpetuities to realty, manifestly abrogates the English doctrine as applicable to personalty. *Expressio unius exclusio alterius.*" Regarding that, in the *De Wolf Case*, Justice COLE said: " There · can be no question but the statute refers to real estate alone. It may, however, admit of doubt whether the remark of the chief justice is strictly accurate in saying that it abolishes the common rule of perpetuities as to personalty *when applied to private trusts.*" " This common rule of perpetuity as to personalty may be unaffected by our statute." The quoted language of Justice COLE was referred to in *Webster v. Morris*, 66 Wis. 366, where the subject under discussion was a charitable trust. It will be noted that Justice COLE's criticism was not intended to cast discredit on the decision in *Dodge v. Williams* or the reasoning of the opinion therein as to public trusts, and it is not supposed that the court in the *Webster Case* intended to do so or to give weight to the criticism. The trust in the *Webster Case* was sustained and the decision was grounded on the principles laid down in *Dodge v. Williams*.

The next case in order of time is *Webster v. Morris*, above mentioned. The opinion therein was written by the present chief justice. The general lines of *Dodge v. Williams* were followed, except the test of certainty to be applied was rather indicated, but not decided, to be sec. 2081 of the statute of uses and trusts. There were two trusts called in question. One was to the First Presbyterian Church of the village of Omro, Winnebago county, Wisconsin, to use one half of the

interest of the fund in defraying the annual expenses of the church, and the other half for the relief of the " resident poor," no particular class of poor being mentioned or particular method or kind of relief suggested. ˙The other bequest was of a sum of money in trust to charity generally, no trustee being named, coupled with a recommendation, which the court held equivalent to a command, that the executors, in the event of their deeming the sum sufficient therefor, establish a school at some place in Winnebago county, to educate young men in the useful arts. It was held that the general bequest for charitable work was invalid, but that the gift to establish a school was valid on the principle that where a bequest is made to alternative purposes, one of which is invalid, it will go to the one which is valid. The mere recommendation to establish a school, as stated, was treated by the court, by judicial construction, as a command. In the same way it was held that the establishment of a school contemplated the organization of a corporation to take the fund as trustee and administer it to educate young men in the useful arts. In the same way it was held that in the event of the fund not being sufficient to establish the school, that being the contingency named by the donor, it might yet be used for that purpose if sufficiently supported by funds contributed from other sources. Generally, it was said, in effect, that while the *cy pres* feature of the statute of Elizabeth — the prerogative jurisdiction conferred by it — is not a part of the law of this state, in so far as judicial power to construe and enforce trusts was exercisable by the chancellors of England, independent of the statute of Elizabeth and only confirmed by it, it is the law here. It will be observed that such doctrine is in strict harmony with *Dodge v. Williams* as to the degree of certainty required within the rules declared. The court said: " The scheme must be sufficiently indicated, or a method provided whereby it may be ascertained and its object made sufficiently certain to enable the

court to enforce the execution of the trust according to such scheme and for such object. It must be of such tangible nature that the court can deal with it. The mere direction to expend money 'for charitable purposes' *at large* is too indefinite and uncertain." The quotation is literal, including the italics. It will be seen that a declared particular purpose, as distinguished from a mere donation of a fund to charity, was all that was deemed essential to a good trust for charitable uses, as regards the work to be performed; and a trust being created with a trustee to select the persons from such indefinite classes as the "resident poor" or "young men," the requisite of definiteness of beneficiaries was satisfied. The case is in strict harmony with *Dodge v. Williams* except in that, as before indicated, in the opinion, as the supreme and essential test to be applied, it was said, referring to the language of one of the trust provisions, "By the language thus employed such trust was fully expressed and clearly defined upon the face of the instrument creating it, and hence satisfies the requirements of subd. 5, sec. 2081, R. S." However, the court did not, as is manifested by the reasoning of the opinion and the decision as well, regard the statutory test essential. So recent as the *De Wolf Case* it had been affirmed that the statute of uses and trusts is limited to real property.

The subject was again discussed in *Hoffen's Estate*, 70 Wis. 522, opinion by Mr. Justice ORTON. The bequest was direct "to the poor of the city of Green Bay." There was no trust, nor any ascertainable devisee or devisees. The bequest was held void in strict harmony with *Dodge v. Williams*, 46 Wis. 70, and *Webster v. Morris*, 66 Wis. 366. The remarks in the opinion as to the indefiniteness of the individual members of the class, "the poor of the city of Green Bay," referred to the absence of definiteness as to devisees, not as to beneficiaries. Much confusion has occurred in citing that case by failing to distinguish between certainty as to donee or

devisee in whom the title may vest, and certainty as to in-
dividual beneficiaries of the trust, which, in the very nature
of things, is impossible. The difficulty, primarily, springs
from confusing private with public trusts, following the idea
that the two are identical in this state in all essential par-
ticulars, requiring certainty of beneficiaries holding the equi-
table title the same as of donees or devisees holding the
legal title, to the end that the former may enforce the trust.
It is plainly indicated in the *Hoffen Case* that the bequest
would have been supported as a trust for charitable uses if
a trust had been created so the court could have filled the
office of trustee to administer the trust.

The next case to be considered is *Fuller's Will,* 75 Wis.
431, where there was a trust, a trustee, and also a par-
ticular purpose and use declared, to wit, the support of a
colporteur and missionary of the Baptist Church within the
state of Wisconsin. It was conceded that the trust was for
a charitable use. The bequest was held invalid because the
testator failed "to fully define his charitable scheme in his
will," going back, apparently, to *Ruth v. Oberbrunner,* 40
Wis. 238, and *Heiss v. Murphey,* 40 Wis. 276. *Dodge v.
Williams* is not cited in the opinion. The rule in *Webster v.
Morris,* to the effect that a charitable scheme to be valid,
"must be sufficiently indicated in the will or a method pro-
vided whereby it may be ascertained and its object made
sufficiently certain to enable the court to enforce the execu-
tion of the trust according to such scheme and for such ob-
ject," was referred to and affirmed; but, as it seems, effect
was given to the rule after the manner of private instead of
public trusts. We will not further consider the case. The
task of harmonizing it with *Dodge v. Williams* and the cases
subsequently ruled by the principles there declared to be
the law of this state, is one, as it seems, too great for room
to hope for its successful accomplishment. There seems to
be but one theory upon which possible harmony can be

based, and that is that the court supposed that the duties of
a colporteur and missionary, which may well be considered
exceedingly uncertain, are so indefinite and indefinable that
the trustee, with the broad discretion vested in the office
under rules governing charitable trusts, could not intelli-
gently define and administer the trust or the court deter-
mine the limits of it. Reasoning along that line, however,
it must be admitted, would be quite too infirm to be adopted
as satisfying any reasonable test of judicial certainty. The
will designated the purpose of the trust to be the support of
a Baptist colporteur and missionary. The broad rules of
construction that easily met all difficulties in the *Webster
Case* would probably have rendered what was supposed to
be fatally uncertain, free from difficulty. The reasonable
expectation and purpose of the testator, it might well be
said, was that the colporteur would be required to do such
work as is ordinarily performed by a Baptist colporteur and
missionary.

In *Sawtelle v. Witham*, 94 Wis. 412, the validity of a trust
for charitable uses was again challenged for uncertainty on
the reasoning in the opinion in *Heiss v. Murphey*, but was
sustained as sufficiently certain to satisfy all the require-
ments of a charitable trust according to the doctrine of *Dodge
v. Williams*, *supra*, and *Gould v. Taylor Orphan Asylum*, 46
Wis. 106, they being cited as stating the law of this state.
There was a trust, but no trustees, those named by the donor
having refused to act. The purpose of the trust and use
declared was to invest the fund and devote the income to
the support, maintenance, education, or aid to that end, of
such indigent orphan children under the age of fourteen
years, in Rock county, Wisconsin, as in the judgment of the
executors may be most needy and deserving. " Vagueness,"
said Mr. Justice NEWMAN, who wrote the opinion, " in some
respects, is essential to a good gift for a public charity;"
and further, in effect, courts will not allow such a trust to

fail because the trustee cannot act, or refuses to act, or the objects of the charity are uncertain. Courts carry out, by liberal judicial rules of construction applicable to such favored donations, the intent of the donor, by supplying a trustee, rather than that the trust fail; and holding that the power of selection of immediate beneficiaries, and of work-. ing out the details of the particular purpose, generally stated, was intended to be a matter of administration by such trustee; and that, according to the judicial policy, well established, charitable bequests are within the department of human affairs where the method adopted, indicated, should be applied rather than that the charitable design of the donor should fail. "*Ut res magis valeat, quam pereat.*"

The most recent case where the question under consideration was referred to is *McHugh v. McCole*, 97 Wis. 166. The only bequest in that case, material at this time, was one to the Roman Catholic bishop of the diocese of Green Bay to be used for masses for the repose of the soul of the testator and the souls of various members of his family. It is sufficient to harmonize the decision condemning the bequest, with *Dodge v. Williams*, 46 Wis. 70, to say that it was considered that the intent was to create a private trust, pure and simple, hence that it was invalid for want of certain beneficiaries to hold the equitable interest, competent to enforce the trust. True, that does not appear very clearly from the opinion, but it was certainly the view of a majority of those who participated in the decision. It must be admitted that the opinion may reasonably be read, as by the supreme court of Illinois in *Hoeffer v. Clogan*, 171 Ill. 462, as supporting the doctrine that trusts for charitable uses must be tested, as to definiteness, the same as private trusts, all distinctions between the two classes of trusts having been abolished in this state. It was said in the opinion, speaking of all the trusts considered, "They are void for uncertainty and wholly incapable of being executed by a

court of equity by virtue of its jurisdiction over private trusts; since they cannot be so executed they must necessarily fail." It will be noted, however, that the precedent cited for condemning the trust for masses treats such a trust as private. Whether such a trust is private or charitable, and whether void if of the former class, there is a conflict of authorities; but they are in substantial harmony in support of such a trust if held public. *Schouler, Petitioner*, 134 Mass. 426; *Festorazzi v. St. Joseph's Catholic Church*, 104 Ala. 327, 25 L. R. A. 360; *Hoeffer v. Clogan, supra; Moran v. Moran*, 104 Iowa, 216. In the *Hoeffer Case*, Mr. Justice CARTWRIGHT, who delivered the opinion, said: 'The rules of law which would invalidate the trust as an express private trust do not affect its validity, because it is a charitable trust. The equitable jurisdiction over such trusts was not derived from the statute of Elizabeth, but prior to and independent of that statute charities were sustained irrespective of indefiniteness of beneficiaries or the lack of trustees, or the fact that the trustee was incompetent to take.' More need not be said in regard to *McHugh v. McCole*. The decision, as indicated, was placed on the ground that a trust for masses is private. So viewed, the decision is in harmony with *Dodge v. Williams*, and whatever was said inconsistent with such view must yield to the decision itself and to the established doctrine of this state distinguishing trusts for charitable uses from private trusts.

Thus we have seen that, with a single exception, the decisions of this court from *Dodge v. Williams* to the present time, are in harmony, and it must be held that such case states the law of this state as understood from the time it was decided. The single break in the line of decisions, in view of the quick return to such line, should not be taken as a considerate change of judgment as to the law at any time. *Dodge v. Williams*, and the cases expressly ruled by it, correctly state the law on the points essential to the con-

clusion here reached, and whatever there is in other cases, decisions, or reasons for decisions, inconsistent therewith, must yield to that view.

It follows that indefiniteness of beneficiaries who can invoke judicial authority to enforce the trust, want of a trustee if there be a trust in fact, or indefiniteness in details of the particular purpose declared, the general limits being reasonably ascertainable, or indefiniteness of mode of carrying out the particular purpose, does not militate against the validity of a trust for charitable uses. Given a trust, with or without a trustee, a particular purpose — as education, or relief of the poor, as distinguished from a bequest to charity generally — and a class great or small, and without regard to location, necessarily, as "worthy indigent females," or "indigent young men studying for the ministry," or "resident poor," or "indigent children of Rock county," or "the boys and girls of California" (*People ex rel. Ellert v. Cogswell*, 113 Cal. 129), and we have a good trust for charitable uses. The court, through its strictly judicial power, may fill the office of trustee if necessary, the trustee can select the immediate beneficiaries or objects within the designated class and scheme; he can determine upon the details necessary to effect the intention of the donor within the general limits of his declared purpose, and execute the trust accordingly; and the proper public agencies, if necessary, can invoke judicial power to enforce such execution. At no step is the court required to exercise *cy pres* power in the sense of prerogative authority, or at all, except as the term is found used in regard to those liberal rules of judicial construction applied by courts of equity to charitable trusts, well exemplified in *Webster v. Morris*, 66 Wis. 366, for determining the intent of a donor in creating a trust for a designated proper charitable purpose. Such power, in the sense last indicated, was exercised in England both before and since the statute of Elizabeth, and has been

exercised in this country since the Revolution, in states where the statute of Elizabeth is part of their system and those where it is not, except in a few instances, as hereafter indicated, where the rejection of such statute was supposed to carry with it the whole common-law system of trusts upon the erroneous theory that the one depended upon the other, and a few states that followed the New York theory that the statutes of uses and trusts and of perpetuities abolished common-law charitable trusts.

A short history of how it came about that the two conflicting theories, discussed in this opinion, came to have some place in our system, will add clearness to the rule adopted as correct. In the formative state of the law in this country after the Revolution, the common law of England, including the principles of equity as there recognized, so far as adapted to our customs, circumstances, and form of government, was accepted as the groundwork of an American system. In that we inherited, in the main, the common-law system of trusts for charitable uses. Two controversies early commenced: (1) as to whether the English system of charities originated with and was depended upon the statute of 43 Eliz. ch. 4; (2) whether such system was adapted to our system of civil government and adopted. The varying conclusions reached as to such controversies resulted in building up different systems in different states, according to their respective judicial determinations in regard to such controversies. In Massachusetts, and some other states, the first controversy named was decided in the negative, and the second in the affirmative as regards the principles of the statute; and the result was an adoption, in such jurisdictions, of the entire common-law system of charities, barring the *cy pres* feature of the statute of Elizabeth, not exercised by courts of equity before the statute,— that is, the prerogative right of disposal outside of the declared intent of the testator, or where there is a gift to charity generally with no use specified and no

trust interposed and no.provision made for appointment, or the power of appointment was delegated to particular persons who died without exercising it. *Going v. Emery*, 16 Pick. 107; *Jackson v. Phillips*, 14 Allen, 539; *Heuser v. Harris*, 42 Ill. 425. In a few instances the statute was rejected *in toto;* notably in Maryland, the very opposite conclusion being reached from that in the Massachusetts court. That is, it was held that the entire common-law system of charities originated with and is dependent upon the statute of Elizabeth; that the statute is not adapted to this country, and that a court of equity cannot enforce the execution of a devise or bequest to charitable uses unless it has all the elements of certainty requisite to a private trust, including certainty of beneficiaries to hold the equitable title corresponding to the legal title vested in the devisees or legatees. *Dashiell v. Attorney General*, 5 Har. & J. 392; *Needles v. Martin*, 33 Md. 609. That was based on an early adjudication by the supreme court of the United States which was overruled after the Maryland system was too firmly established to be changed without unduly disturbing property rights. The beneficiaries, it was held, must be sufficiently definite to be recognized by the court as entitled to enforce the trust after the manner of private trusts, the following designations of beneficiaries being held fatally defective: "The education of free colored persons in the city of Baltimore;" "Resident indigent and necessitous poor persons of the Twelfth ward of the city of Baltimore." *Barnum v. Baltimore*, 62 Md. 275. In *Philadelphia Baptist Asso. v. Hart's Ex'rs*, 4 Wheat. 1, opinion by Chief Justice MARSHALL, decided in 1819, the law was laid down on the lines followed by the Maryland court four years later, as above indicated, the ground of the decision being that the English system of charities originated with, and is wholly dependent upon, the statute of 43 Eliz. ch. 4. In the famous *Girard Will Case* (*Vidal v. Philadelphia*), 2 How. 127, in which Mr.

Binney appeared on the one side and Mr. Webster on the
other, and the opinion was delivered by Mr. Justice Story,
in one of the most exhaustive treatments of the question
ever given to a subject in that great court, *Philadelphia
Baptist Asso. v. Hart's Ex'rs* was overruled, and it was held
that the common-law system of charities did not originate
with, nor was it dependent upon, the statute of Elizabeth.
Speaking of some forty English authorities examined, Mr.
Justice Story said: 'They show that trusts for charitable
uses were known and enforced in courts of equity through
their strictly judicial powers long before the statute of Eliza-
beth in cases where there was indefiniteness as to beneficia-
ries, where the charity itself was uncertain, where there was
no trustee appointed, or the trustee was not competent to
take.' That view of the law was adopted and has since been
adhered to by the federal court. *Perin v. Carey*, 24 How.
465; *Kain v. Gibboney*, 101 U. S. 362. It was adopted in
many of the states before the law was settled as above, and
by all, afterwards, where the question was open to discus-
sion as to trusts specifying in general language the kind of
charitable work to be done.

In New York the situation at the start was complicated
by the fact that in 1788 a law was passed repealing the stat-
ute of Elizabeth. Laws of N. Y. 1788, ch. 46, § 37. It was
claimed that when that circumstance occurred it was com-
monly understood that the English system of charities was
dependent on the statute of Elizabeth, hence that its repeal
should be held to show a legislative intent to abolish the
whole common-law system of charities. The contrary, how-
ever, prevailed, the law being settled substantially as after-
wards laid down in the *Girard Will Case. McCartee v.
Orphan Asylum Soc.* 9 Cow. 437. Then came the statutes
of 1829, of perpetuities and of uses and trusts. The con-
troversy soon arose, thereafter, as to whether the legislative
intent, by the general language of those statutes, was to

abolish trusts for charitable uses.  The situation at this point
may be best illustrated by quoting from the opinion of Chan-
cellor SANDFORD in *Shotwell v. Mott*, 2 Sandf. Ch. 4ᴜ: " We in-
herited from our mother country the law of charitable uses,
with the blessed spirit that gave rise to it."   " Did the Re-
vised Statutes intend to cut off gifts and devises to chari-
table uses for all time to come ?  For if the article ' *Of Uses'
and Trusts*' applies to charitable uses, that must have been
the intention in respect to all save devises to corporations
directly for their own use.   The proposition is startling and
of vast importance, and I presume every one on first hear-
ing it will declare that it is impossible; that no legislature
of the nineteenth century could have intended such a re-
sult."   By analogy to the common-law policy regarding char-
itable uses, and authorities to the effect that statutes in
general language in England had been uniformly construed
there as not affecting public trusts, a conclusion was reached
that the New York statutes were but re-enactments of the
common law, and were not intended, said the chancellor,
" to affect charitable uses or public trusts, which spring from
benevolent instead of interested motives, and are for the
benefit of classes of people not personally known to the ben-
efactor, and not for the pecuniary advantage of a designated
individual."   Such was the situation when this state was
admitted into the Union and the statutes of perpetuities and
of uses and trusts were adopted substantially as they now
exist, in all essential particulars copied from those of New
York, except that personal property was omitted from the
statute of perpetuities. In *Williams v. Williams*, 8 N. Y. 524,
decided in 1853, the law as laid down by Chancellor SAND-
FORD, and in the *Girard Will Case*, was examined and adopted
as the law of New York, in an opinion by Mr. Justice DENIO,
which for depth of research, leaves little room, if any, for
discussion.   A few years later, in *Owens v. Missionary Soc.*
14 N. Y. 380, the soundness of *Williams v. Williams* was

called in question. From that time on there was a "judi-cial struggle" over the subject for a period of some twenty years. It did not wholly end with *Levy v. Levy*, 33 N. Y. 97, decided in 1865, which placed public trusts on the same basis as private trusts, overruling *Williams v. Williams.* The controversy thereafter definitely reached this court in *Ruth v. Oberbrunner*, 40 Wis. 238, and *Heiss v. Murphey*, 40 Wis. 276, where *Levy v. Levy* was followed. Thereafter a similar decision was made in Michigan (*Methodist Episcopal Church of Newark v. Clark*, 41 Mich. 730) on the strength of *Ruth v. Oberbrunner* and the New York authorities, rejected as not controlling in *Dodge v. Williams*, 46 Wis. 70, which had been decided but not published. The dispute in New York may be said to have ended in 1873, when in *Holmes v. Mead*, 52 N. Y. 332, the law was declared settled on the lines of *Levy v. Levy, supra*, and *Bascom v. Albertson*, 34 N. Y. 584, the court saying, substantially, that the statute must be held to have abolished all uses and trusts except those particularly named therein, leaving the court no discretion to support a charitable trust having no certain beneficiaries competent to hold the equitable title and to enforce the trust. The *Tilden Will Case* in 1891 (*Tilden v. Green*), 130 N. Y. 29, developed so fully the mischiefs of the system that had been constructed on the ruins of *Williams v. Williams*, that in 1893, by chapter 701 of the laws of that year, the former doctrine was in effect restored. So it will be seen that, so far as this court departed from the true line, there was a quick return, while the departure was so long continued in New York that it required a legislative enactment to remedy the difficulty.

Before applying to this case the principles above indicated to be the law, a suggestion should be considered as regards whether the promotion of temperance is a proper subject for a charitable trust, a question on that point having been raised by respondents' counsel. A general statement of the essentials of a charity, as regards the character

of the work to be performed, will substantially solve the question. It includes everything that is within the letter and spirit of the statute of Elizabeth, considering such spirit to be broad enough to include whatever will promote, in a legitimate way, the comfort, happiness, and improvement of an indefinite number of persons. To that extent such statute is generally held to be a part of the common law of states even that reject all the other features of it. To mention the particular objects of charity named in the English statute would serve no practical purpose, so that is omitted. The general scope of the statute, considering its letter and spirit, as before indicated, has been judicially stated by judges of great learning, whose statements have come to be referred to generally in judicial opinions as the true test rather than the statute itself. The most familiar judicial statement of the law, as recognized by the courts, is known as Gray's rule, and is found in *Jackson v. Phillips*, 14 Allen, 539, where the bequest under consideration was for the benefit of fugitive slaves, an object quite remote from any specifically mentioned in the English statute. It was held, nevertheless, to be within the spirit of the statute. After discussing various views of the term " charity " as applied to charitable trusts, Justice GRAY said: " A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in its nature." Another definition often quoted was given by Mr. Binney in the *Girard Will Case (Vidal v. Philadelphia)*, 2

How. 127.   It is as follows: "Whatever is given for the love of God or for the love of your neighbor in the catholic and universal sense — given from these motives and to these ends — free from the stain or taint of every consideration that is personal, private, or selfish."   Perhaps a more concise, comprehensive, and practical definition is that found in *Missouri Historical Soc. v. Academy of Science*, 94 Mo. 459, as follows: "Any gift, not inconsistent with existing laws, which is promotive of science or tends to the education, enlightenment, benefit, or amelioration of the condition of mankind, or the diffusion of useful knowledge, or is for the public convenience, is a charity within the meaning of the authorities, whether so denominated in the instrument which evidences the gift or not."   Another rule, capable of being understood and applied by any person of ordinary understanding, was given by Lord Camden in *Jones v. Williams*, Amb. 652, and approved by the supreme court of the United States in *Perin v. Carey*, 24 How. 465, as follows: "A gift to a general public use, which extends to the poor as well as the rich."   The theory of that is that the immediate persons benefited may be of a particular class, and yet if the use is public in the sense that it promotes the general welfare in some way, it has the essentials of a charity.

The rules above given are sufficiently comprehensive to render search for precedents where the promotion of temperance has been considered charitable work, unnecessary, though it may be noted that in *Saltonstall v. Sanders*, 11 Allen, 446, a gift to a trustee to promote, or in aid of, objects and purposes of temperance, was held to be a good charitable trust.

Great and fatal indefiniteness is suggested in regard to the meaning of the term itself, "temperance work in the city of Milwaukee," as used by the donor.   To refer to dictionaries for definitions, and display a number of meanings

that might be read out of the term, would only tend to ob-
.scure that which is plain. In the light of the facts, the term
means, obviously, work to prevent, so far as practicable,
the use of intoxicating liquors. If there were any doubt
about that, the character of the work pursued by the organ-
izations selected to receive special aid from the trust fund
would readily solve it.

Further uncertainty in the scheme is suggested in that
the trustees are directed to expend the greater part of the
fund for the benefit of the two corporations named, and
upon the happening of a specified contingency, namely, the
determination of either corporation to build a building, to
use the funds then remaining to that end. No difficulty is
discovered in any of these matters. They are uncertainties
of a character commonly found in charitable trusts. They
are easily within the discretionary power of the trustees to
solve within such limits as the court may define, if neces-
sary, by judicial construction. They are matters of detail
much more easy of determination than how to preserve a
trust fund left to establish a school "for the education of
young men in the useful arts" on the contingency of its
being sufficient for that purpose, in case the contingency
never happens; or what poor are to be benefited and the
nature of it, in the bequest for the relief of the resident
poor, found to be free from difficulty in *Webster v. Morris*,
66 Wis. 366.

There is little left that need be said in drawing a correct
conclusion from the foregoing, as to whether the trust in
question is valid. As before indicated, the vital question
involved is: whether charitable trusts, as distinguished from
private trusts, have been abolished in this state, leaving only
the latter as regards the essentials of certainty and rules of
construction applicable; that is, whether the New York
doctrine, adopted in the opinions in *Ruth v. Oberbrunner*, 40
Wis. 238, and *Heiss v. Murphey*, 40 Wis. 276, or the decision

and opinion in *Dodge v. Williams*, 46 Wis. 70, is to prevail. The conclusion reached is in favor of the latter. No other can be reached without overruling the entire judicial system based on the doctrine there adopted and here affirmed. The degree of certainty that such doctrine requires is correctly stated in *Webster v. Morris* and often since affirmed, as we have seen. That is, " The scheme of charity must be sufficiently indicated, or a method provided whereby it may be ascertained, and its object made sufficiently certain to enable the court to enforce the execution of the trust according to such scheme and for such object. It must be of such a tangible nature that the court can deal with it. The mere direction to expend money for charitable purposes *at large* is too indefinite to be carried into execution." 66 Wis. 391. In order not to depart from the correct line, however, the rule must be considered, not with reference to the statutory rule of certainty (sec. 2081, Stats. 1898), or that which is required in regard to private trusts, as indicated in *Ruth v. Oberbrunner*, and perhaps in *McHugh v. McCole*, 97 Wis. 166, but with reference to those liberal rules for judicial construction, applicable to charitable trusts.

It should be noted in passing, that the rule above discussed, as indicated in the opinion where it was first pronounced, is based on the text in 2 Redf. Wills, 409, subds. 2–4; Id. 505, subd. 16, treating of the subject of certainty required in private trusts. The rule, however, is well adapted to charities, keeping in mind those judicial rules of construction mentioned, applicable to charitable trusts, and the essentials of a private trust, not material to a trust for charitable uses. That is, that certainty of beneficiaries holding the equitable title, who can enforce the trust, sometimes dwelt upon, is inconsistent with a public trust. The court in pronouncing the rule clearly indicated that it should be applied, having in view the considerations mentioned, by adding the explanatory sentence, to the idea deduced from the text of

Redfield on private trusts, viz., "The mere direction to expend money for charitable purposes *at large* is too indefinite and uncertain to be carried into execution under the rulings of this court in the cases cited," referring to *Dodge v. Williams* as the last of such cases, limiting certainty in charitable trusts. If it were intended by the rule to mark the limitation of indefiniteness permitted in private trusts, the explanatory sentence would not have been used, which accurately marks the limitation applied generally to trusts for charitable uses,— that corresponding to the division between judicial and prerogative power. So the rule in the *Webster Case* merely excludes the exercise of *cy pres* power strictly so called, that is, as understood by the English court, the power (as said by Lord ALVANLEY, in *Attorney General v. Boultbee*, 2 Ves. Jr. 380, and by Lord ELDON, in substance, in *Mills v. Farmer*, 19 Ves. 485, and approved by the Master of the Rolls in *Cherry v. Mott*, 1 Mylne & C. 123), where execution of the donor's purpose literally is impossible, to execute it otherwise, consistent with the general intention, so as to execute it in substance, though not in mode, considering charity as the legatee and mere mode of execution not of the substance of the donation.

It is not considered that anything new for this state has been decided in this case or that there has been any departure from the law as heretofore established and as the same has existed for a period so long as to become a rule of property that should not be disturbed. If there were any leaning toward a change in equity power, as to charitable trusts, but there is none, it would naturally be toward enlarging rather than restricting it. As said by the learned chief justice in the case here so often referred to, "From time immemorial, the general inclination of courts of equity has been that way. 'Charity in thought, speech, and deed challenges the admiration and affection of mankind. Christianity teaches it as its crowning grace and glory.'" *Dodge v. Will-*

*iams*, 46 Wis. 91. Donations in trust to that end, it is said, should not be declared void if they can by any possibility, consistent with law, be considered as good. So courts of equity go to the length of their judicial power rather than that such a trust should fail, applying the maxim, *Ut res magis valeat, quam pereat.*

*By the Court.*— That part of the judgment appealed from by *George Henry Andrews* and *William Andrews* is reversed. On the appeal of the executrix and trustees the judgment is reversed. Costs will be allowed in favor of the executrix and the trustees on their appeal against their co-defendants, *George Henry* and *William Andrews*, and plaintiffs. Costs will be allowed to *George Henry* and *William Andrews* on their appeal against the plaintiffs. The cause is remanded for further proceedings in accordance with this opinion.

CASSODAY, C. J. I must respectfully dissent in this case. In doing so I must acknowledge that I am not certain that I fully comprehend just what general propositions have, and just what general propositions have not, been determined in this case. Nor am I certain as to how many of the former decisions of this court have been in part overruled, doubted, questioned, or distinguished, notwithstanding the statement near the close of the opinion filed, to the effect that nothing "new for this state has been decided in this case," and that there has been no "departure from the law heretofore decided." The general rule undoubtedly is that a decision of any court "not in harmony with some of its previous decisions has the effect to overrule those with which it is in conflict, whether mentioned and commented on or not." *Asher v. Texas*, 128 U. S. 129. But it is also a well-recognized general rule "that the positive authority of a decision is coextensive only with the facts on which it is made." Chief Justice MARSHALL, in *Ogden v. Saunders*, 12 Wheat. 333. *Evans v. Virgin*, 72 Wis. 427.

I have no purpose here of discussing any of the propositions involved in this case,— much less those considered in the opinion filed, and which, in my judgment, are not involved in this case. I merely state my position in order to show the limit of my responsibility. I do not understand that the question of perpetuities is involved in the case, or suggested by anything in the record. The trustees were commanded to expend all funds within five years. I concur in some of the conclusions reached by the court. The direction in the will to convert real estate into personalty is clearly mandatory, and, under the repeated decisions of this court, the real estate must be regarded as personal property. *Ford v. Ford*, 70 Wis. 46–48, and cases there cited. The clause in the will giving the greater portion of such trust funds for the benefit of Crystal Spring Lodge, I. O. G. T., and the Woman's Christian Temperance Union of Milwaukee, I think may be sustained, as they are both found by the court to be existing corporations under the laws of this state. True, the findings leave the inference that one of them is a mere *de facto* corporation. This court has gone so far, however, as to sustain bequests to a corporation not in existence at the death of the testator, but to be subsequently incorporated and organized. *In re Taylor Orphan Asylum*, 36 Wis. 534; *Dodge v. Williams*, 46 Wis. 100–102; *Gould v. Taylor Orphan Asylum*, 46 Wis. 106; *Webster v. Morris*, 66 Wis. 394–397. Those cases, or some of them, might have been decided differently in the absence of any direction to establish such contemplated corporation. The corporations, in the case at bar, were to have at least one half of three fourths of the net proceeds of the estate, and more, if not all, in case either of such corporations should erect the building therein mentioned. But the balance of such net proceeds, if any, was to be "used and expended" by the trustees "in temperance work in said city of Milwaukee, as their best judgment shall dictate." In my judgment

such mere direction to use and expend money in temperance work, like a mere direction to expend money "for charitable purposes," at large, is too indefinite and uncertain to be carried into execution under the repeated rulings of this court, cited in the opinion filed, and under the rulings of numerous other courts, some of which are cited in the opinion filed. Of course, I do not refer to English decisions based on the statute of 43 Eliz. ch. 4 (2 Stat. 708), nor to decisions from states which have adopted, in substance or in fact, that statute. This court has repeatedly held, in the cases cited in the opinion filed, that that statute was not in force in this state. "By that statute it was made lawful for the 'Lord Chancellor, as keeper of the great seal, . . . to' authorize four or more persons,' in case of such general bequest, to devise and carry into execution a charitable scheme of the character indicated in the act." *Webster v. Morris,* 66 Wis. 391. "That was a prerogative power exercised by the keeper of the great seal as the representative of the king, and not by him sitting merely as chancellor." *Id.* But the courts of this state, as held in the cases referred to in the opinion filed, have no such prerogative jurisdiction, but "only a strictly judicial power." *Id.* Of course, all judicial powers which existed before the enactment of that statute necessarily existed outside of the statute, and hence are no part of the statute. That statute was for the very purpose of enabling the chancellor, not as a judge, but as the representative of the crown, to devise a scheme to carry out any of the numerous general purposes mentioned in the act (of which temperance is not one), for and in the place of the testator; that is to say, to make a complete disposition of his property, which the testator had failed to make.

In *Dodge v. Williams,* 46 Wis. 90, Chief Justice RYAN quoted from Chief Justice GIBSON this sentence: "Every sane man must be allowed to make his own contract as well as his own will." He then added: "That great jurist plainly

suggests that courts have no more authority to make wills
for the dead, than contracts for the living, according to ju-
dicial notions of fitness and propriety." *Id.* The testatrix,
in the clause of her will in question, directed the money to
be expended in temperance work; but no reference is made
as to how or in what manner it was to be so expended, or
to whom paid, or who should be the beneficiaries.   In other
words, and with the construction placed upon it by my breth-
ren, it authorizes the trustees to make a will for the deceased
which she failed to make for herself.   'This, in my judgment,
is a wide departure from the principles of law which have
long been established in this and other courts where the *cy
pres* doctrine under the English statute mentioned is not in
force.   That doctrine, as I understand it, allowed the rep-
resentatives of the crown, under the act of parliament men-
tioned, to substitute what, in their judgment, was practi-
cally the nearest to what was supposed to be intended by
the testator, but what he in fact had failed to express.   Even
in England, where that doctrine and that statute have been
in force for 300 years, it has been held that a bequest to the
bishop of Durham, his executors, etc., upon trust to pay the
debts of the testatrix, and legacies, etc., and " to dispose of
the ultimate residue to such objects of *benevolence and liber-
ality* as the bishop of Durham, in his own discretion," should
most approve of, and then appointing the bishop her sole
executor, was void, because it was not within the terms of
the statute of Elizabeth.   *Morice v. Bishop of Durham,* 9
Ves. 399.   In that case that eminent master of the rolls,
Sir WILLIAM GRANT, said: " If there be a clear trust, but
for uncertain objects, the property that is the subject of the
trust is undisposed of, and the benefit of such trust must
result to those to whom the law gives the ownership in de-
fault of disposition by the former owner.   But this doctrine
does not hold good with regard to trusts for charity.   Every
other trust must have a definite object.   *There must be some-*

*body in whose favor the court can decree performance.* . . .
Then is this a trust for charity? Do purposes of liberality
and benevolence mean the same as objects of charity? That
word, in its widest sense, denotes all the good affections
men ought to bear toward each other; in its most restricted
and common sense, relief of the poor. In neither of these
senses is it employed in this court. *Here its signification is
derived chiefly from the statute of Elizabeth.* Those pur-
poses are considered charitable *which that statute enumerates,*
or which by analogies are deemed within its spirit and in-
tendment, and to some such purpose every bequest to char-
ity generally shall be applied. But it is clear, liberality and
benevolence can find numberless objects not included in
that statute, in the largest construction of it. . . . By
what rule of construction could it be said all objects of lib-
erality and benevolence are excluded which do not fall
within the statute of Elizabeth? The question is not whether
he may not apply it upon purposes strictly charitable, *but
whether he is bound so to apply it?* I am not aware of any
case in which the bequest has been held charitable where
the testator has not either used that word to denote his
general purpose, or specified some particular purpose which
this court has determined to be charitable in its nature."
*Id.* 405, 406. So the trust in that case was held void for
uncertainty, because " benevolence and liberality " were not
mentioned in, and hence not supported by, 43 Eliz. ch. 4.
Neither is temperance or temperance work mentioned in
that statute, and yet it is as general and indefinite as "be-
nevolence and liberality." Besides, it opens the door for
the dissipation of the estates of persons who have no defi-
nite conception of what disposition they would make of
their property, and so leave their property to be disposed
of by their trustees after having expressed a general purpose
or object of the bequest.