SAMUEL NORTHRUP CASTLE, EXECUTOR OF THE
ESTATE OF HARRIET CASTLE COLEMAN, DE-
CEASED, *v.* MARY ERMINE CROSS.

No. 1977.

ARGUED OCTOBER 1, 1931. DECIDED NOVEMBER 25, 1931.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY PERRY, C. J.
(Banks, J., dissenting.)

This is a suit in equity for an accounting, instituted
by the petitioner as executor of the will of Harriet Castle
Coleman. The allegations of the petition were in brief

**198**

that the respondent was the very close and intimate friend of the decedent, lived in her home for about fifteen years, under a power of attorney and otherwise transacted business for Mrs. Coleman and did not keep a strict and accurate account of the affairs of the decedent; and that the respondent had failed and refused, upon demand, to render an accounting. There were other allegations, now immaterial. The master to whom the cause was referred for examination reported his findings upon many subjects which had been under investigation by the parties at the hearing before him. Upon the report coming before the circuit judge the controversy narrowed itself to one issue and that was whether certain moneys which had been placed on deposit in a bank by the decedent constituted a trust fund beyond the power of the executor or were a part of the property of the decedent, to be administered upon by the executor. Of the two accounts in question one was opened in the savings department of the Bank of Bishop & Company on March 16, 1923, with a deposit of $2000 and is entitled "Account of Harriet Castle Coleman and/or Ermine Cross, Tr's for Henry and Dorothy Foundation, payable to either or survivor." The other is an ordinary checking account with the same Bank of Bishop & Company, opened April 11, 1923, with a deposit of $2000 and entitled as follows: "Deposited with the Bank of Bishop & Co., Ltd. to the credit of Henry and Dorothy Foundation, Harriet Castle Coleman and/or Ermine Cross, Trustees."

At the dates when these two accounts were opened there was in existence no trust or account or legal entity known as the Henry and Dorothy Foundation. The origin of the expression will appear later. So, also, at the dates of the opening of these two accounts and at all other times during the acquaintanceship of Mrs. Coleman and Ermine Cross the latter was the devoted and faithful friend of

the former, fully recognizing and admiring Mrs. Coleman's marked business ability, but in connection with the business affairs of Mrs. Coleman Miss Cross did not exercise any independent judgment of her own, but always did exactly what Mrs. Coleman desired her to do. Mrs. Coleman had, prior to the opening of these two accounts under investigation, maintained an account in the name of "Mary E. Cross, Trustee," another in the name of "Ermine Cross, Trustee," still another in the name of "Ermine Cross, Special," and perhaps one or two others in Miss Cross's name, and Miss Cross signed checks on these accounts (in which were deposited moneys of Mrs. Coleman), but always did so strictly in accordance with the requests of Mrs. Coleman. The latter from time to time placed stocks in the name of Miss Cross, but in Miss Cross's own words, "I knew nothing about her business. I signed on the dotted line when she put stock in my name." As otherwise expressed by the same witness on the stand, when asked whether she "ever operated under" a certain system: "I did not operate. I only endorsed. I endorsed every certificate Mrs. Coleman put in my name." The trustee's stock was "in my name but all I did was to endorse." In these and other ways the respondent has made it abundantly clear by her testimony given in the case at bar that in connection with Mrs. Coleman's business affairs generally and in particular in connection with the several "Mary E. Cross, trustee," accounts she was simply an obedient and faithful agent who never ventured and was not expected to venture opposition to Mrs. Coleman's plans or dispositions. The same we find was true with reference to her service under the title of "trustee" in the two bank accounts under consideration. She was not an independent trustee. To put the account in that name was simply, and was intended to be simply, to place the fund at the

sole disposition of Mrs. Coleman while she lived. We think that in spite of the titles under which the two accounts were opened they should be regarded as though they had been opened solely in the name of Mrs. Coleman, even though marked "trustee."

It may be assumed for the purposes of this case that a trust may be created with the creator named as the sole trustee. It may likewise be assumed that a trust declared to be for the purpose of aiding education generally or for the purpose of aiding "progressive education" in particular is sufficiently definite and certain to exist and to be enforced. The question remains whether upon the evidence adduced Mrs. Coleman intended by the opening of the two accounts, one in the savings bank and one in the checking department of Bishop & Company, to create a trust.

When, as in this case, there is no formal, written declaration of trust and an account is opened in a bank in the name of the owner and depositor under the mere title of "trustee," or in the name of the depositor and one other person, "trustee, payable to either or survivor," other evidence may be resorted to in order to ascertain whether the owner intended to create a trust. Both parties in this case have proceeded upon this theory. The question is, do the facts show an intent to create a present trust?

A mere bank deposit made by a person in his own name as "trustee" or in his name and that of a faithful and obedient agent as "trustees," for a "Foundation" which has no legal existence, over which deposit the depositor exercises complete control during his life, is insufficient to create a trust entitling the supposed beneficiary to the deposit as against the depositor's administrator. 3 R. C. L. 717.

Under date of March 31, 1920, Mrs. Coleman executed

a deed of trust whereby she transferred to the Hawaiian Trust Company, Limited, a corporation, certain United States Liberty Loan Bonds and Victory Loan Bonds of the par value of $33,000 upon certain trusts. "This property," it was therein recited, "together with any and every addition thereto to which may be made at any time hereafter by anyone, shall be known and designated as the 'Henry and Dorothy Foundation.'" (Henry and Dorothy were relatives of Mrs. Coleman who had perished in a marine disaster.) This apparently was the origin of the expression "Henry and Dorothy Foundation." Trusts were in the deed declared as follows: "To collect the income therefrom and after deduction of expenses and of the commission hereinafter set out, to pay over and apply the said income under my direction and upon my order and/or under the direction and upon the order of Mary Ermine Cross of said Honolulu as long as both or either of us shall continue to survive, we to have joint and several authority while we both survive, and the survivor to have sole authority during her life, as follows: for the support and maintenance of the family school at Castle Home, 'Puuhonua,' in Manoa Valley, Honolulu aforesaid, now being conducted in accordance with and based upon the educational ideas and their legitimate outcome advocated by John Dewey as indicated in such books as 'Democracy and Education' by John Dewey and other similar books." There were additional provisions for the contingency of the school at the Castle home not continuing to exist or not requiring the whole of the income of the trust fund. In the instrument power was expressly reserved by the grantor to revoke the trust by filing with the trustee a written instrument to that effect. This deed of trust was in fact revoked, but upon what date does not appear in the record. Upon the revocation, the trust property was all redelivered to Mrs.

Coleman. She thereupon used $8000 of the principal in such ways as she saw fit and on January 21, 1922, executed a second deed of trust to the same trust company, transferring Liberty Bonds of the face value of $25,000 only, giving the trust property the same name of "Henry and Dorothy Foundation," and stating the purposes of the trust substantially as in the earlier deed. This second deed of trust was likewise upon its face made revocable and was revoked on December 19, 1922. Upon its revocation the trust property was again redelivered to Mrs. Coleman.

Of the $25,000 of bonds thus returned $5000 was given by Mrs. Coleman to two relatives and $5000 was retained by her because she had theretofore made certain advances for the Castle home school, which was known as a progressive school. The remainder of $15,000 or thereabouts was deposited, not all at one time, in the two accounts immediately under investigation.

In the language of her own attorney, "the respondent does not of course contend that between the date—December 19, 1922—of the revocation of the second trust deed and March 16, 1923, the date of the opening of the savings account in Bishop & Co., there was any legally created trust;" but it is contended in her behalf that "during that period the testatrix considered that, and acted as if, she was holding a number of the bonds, in trust for the purposes of progressive education" and that "from the time of the execution of the first trust deed right up to her death her fixed intent was to assist financially the cause of progressive education, and that, while from time to time she reduced the amount * * * she never wavered or shifted from the purpose to establish a trust in favor of the specific charity above referred to, and did finally establish it by the opening of the trust accounts in the names of the respondent and herself as

joint trustees." The mere fact that the two accounts were opened and maintained under the titles above quoted is not itself determinative that a trust or trusts were thereby created. · Resort must be had to the testimony and other evidence adduced not only to ascertain what were the purposes of the trust, if a trust were proven, but also to ascertain whether or not Mrs. Coleman intended thereby to create a legal trust. So also the mere fact that she called it a "trust" or named herself and Miss Cross "trustees" is not sufficient. The accounts are still subject to construction and explanation.

It is contended by the respondent that the execution of the two deeds of trust is evidence tending to show an intention on Mrs. Coleman's part to create a trust in 1923 by making the two deposits or series of deposits under consideration. To our minds her conduct with reference to these two deeds carries an inference quite to the contrary. Her execution of the two deeds and her acts thereunder show clearly that Mrs. Coleman was perfectly familiar with that method of creating a valid trust and, in general, with the provisions that such instruments must contain in order to sufficiently express an intention to create a trust recognizable in law as such. Having this knowledge she deliberately chose in March and April of 1923 not to follow that procedure but instead to merely open an account in the bank. There must have been a reason for this decision. We infer that the reason was that she wished not to be bound or limited in her acts as she would be if she were to execute a formal instrument of the general character of the two deeds. She wished to reserve for herself entire freedom of action, entire freedom to dispose of even the moneys so deposited to whatever purposes she might incline from time to time. She revoked the first deed of trust and immediately used $8000 of the capital for her own purposes. When next

she created the trust it was with a capital of only $25,000 and when the second trust was revoked she withdrew $10,000 of that sum for purposes of her own choosing and later deposited in the two bank accounts only $15,000. Her failure to execute a third deed of trust naming, let us say, herself and Miss Cross as trustees, indicates to our minds that such a trust was exactly what she did not want. She wanted merely a bank account like that of "Mary E. Cross, trustee," upon which she could draw checks at her pleasure for purposes of her own choosing,—even though it was at that time her thought that much of the money would be devoted to the aid of progressive education.

In 1918 Mrs. Coleman had expended of her moneys for the assistance of "Castle Home School," an institution understood by her to teach "progressive education," the sum of $1112. In 1919 she spent for the same purpose $2467; in 1920, $4025; in 1921, $1620; and in 1922, $1100, —or a total of $10,324 during the five years just named. Deducting from this total the sum of $940 which had been expended "for transportation" (see exhibit No. 24, slip No. 1), the remaining balance was $9,384. In 1921, 1922 and 1923 (prior to April 11) Mrs. Coleman repaid herself $2300 of this amount, leaving a balance of $7084 expended by her during the five years named in aiding progressive education. After the opening of the two bank accounts under consideration, the two trustees repaid to Mrs. Coleman out of this so-called trust fund at least $5000, and perhaps the whole $7084, and this they did because to them, in the language of the respondent herself found in another part of exhibit 24, "it seemed fitting that this fund should reimburse her, as its first great outlay." This reimbursement to Mrs. Coleman of moneys expended by her in the five years from 1918 to 1922 inclusive is reconcilable with the theory that the moneys

deposited in the two bank accounts were hers to do with as she pleased, but is not reconcilable with the view that the two deposits constituted trust funds for the "aid of progressive education." A trust fund for that purpose would be properly usable for aiding education to be thereafter furnished to the young. It would not ordinarily be understood as being deposits to be used in recompensing individuals for education of that nature long since furnished. In any event that use of the moneys indicates to us a belief and understanding on Mrs. Coleman's part that she was not bound by the limits of any trust legally established.

Nor can this disbursement or other payments which were made for non-trust purposes be accounted for as revocations *pro tanto* of the trust. Mrs. Coleman was perfectly familiar with the possibility and the procedure of revoking a trust, in whole or in part. She had revoked a trust twice before. She had withdrawn parts of the principal and reconstituted a trust as to the remainder. Again, in a memorandum dated April 16, 1923, and signed by both Mrs. Coleman and Miss Cross, each as "Trustee —H. & D. Foundation," the two ladies declared that they "have decided that this fund shall assume the whole expense which was incurred by H. C. Coleman in financing the Progressive Education School at the Castle Home, which school was started in September 1918, and finally closed in June 1922." It is to be observed that they did not decide that the trust should be *pro tanto* revoked, in which case no statement of the proposed use of the funds withdrawn would have been necessary, but that they decided that *"this fund,"* such as it was, should bear the expense named. In other words they felt, not that they were partially revoking the trust, but that the fund was such that they could use it for such purposes as to them seemed fitting.

Another enlightening bit of evidence is to be found in Master's exhibit No. 24, in its opening pages, in a penciled memorandum written by the respondent herself within a very few days after the opening of the accounts. She there says of this fund: "originally it was spoken of as a traveling fund to defray expenses for the talked and dreamed of trip to Egypt & return. From time to time its purpose changed—the money was invested and reinvested. Finally—during the war—when sugar was high—the stock was sold and the money reinvested in Liberty Loan Bonds, and as at that time our great interest was in Progressive Education we resolved to call the *investment* The Henry & Dorothy Foundation, the principal and interest to be used to assist the cause of progressive education in Honolulu or elsewhere, until the account shd. be closed." In other words the fund, although bearing the name of the Henry and Dorothy Foundation, was regarded by the respondent and her principal merely as a particular "investment." There is no suggestion in this memorandum of the establishment or maintenance of a legal trust.

In support of the contention that the two accounts in question constituted a trust, reliance is also had by the respondent upon a letter, dated December 21, 1922, written by Mrs. Coleman and addressed to George Mead, a relative of hers who was then living in Chicago. That letter reads as follows: "I have come to the definite conclusion considering all the personalities I have to deal with—that if I have any money to spend I would better spend it while I am alive—and so I am breaking up this Foundation—of which you may or may not be cognizant —and am going to distribute it now—I am sending you this portion of it for safe keeping if you will be so kind to add this to your many kind offices on my behalf— you will see by the terms of the enclosed duplicate of

the deed now revoked what I had planned to do with it—and I still propose to follow this plan in general—though with principal instead of interest—sooner or later—Please consider its disposal subject to instructions from my self or Ermine Cross—and in the event of our departing before it is distributed—then I hereby authorize you—George Mead—and Helen K. Mead to dispose of it, interest or principal according to the terms of the deed—but with discretionary power to amend—so long as it is for educational purposes. I intend to write more fully of this later." Assuming, that which is not free from doubt, that this letter in itself would have constituted a trust, the obvious answer to the contention is that the letter was never delivered. It remained in Mrs. Coleman's possession and was found amongst her papers. It may be a record of thoughts that were going through her mind at the time, but the conclusions therein referred to were not sufficiently definite to lead her to entrust the letter to the mails or to its addressee. At this point it may be said that it clearly appears from the evidence that Mrs. Coleman, able and attentive as she was in matters of business, had a habit of thinking on paper, just as some have a habit of thinking aloud. Many crude memoranda, written by her, are in evidence which clearly were not intended to be decisions, but merely attempts to state more clearly thoughts which were in the process of formation. At the best the letter referred to was in this class; but it was never acted upon. Neither George nor Helen Mead was ever entrusted with any of the powers there discussed. The respondent herself has testified in this case that Mrs. Coleman told her that the letter had not been sent to George Mead because "she had decided to use the bonds in another way; that she wished to sell them here in the market, or otherwise, *and use the principal herself.*" This direct testimony strengthens our

belief and finding that to Mrs. Coleman it was of the utmost importance that she should retain complete control over the disposition of her funds even though at the moment she might be inclined to use them for this or that charitable purpose.

After the opening of the two bank accounts $300 was paid therefrom for "nutrition," not in the schools that taught "progressive education," but in the public schools generally. The explanation given by the respondent in her testimony is that this was "a very forward movement in the public schools; therefore it comes under the head of the large reading of progressive education." Helping to defray the cost of nutrition in the public schools generally, however praiseworthy that object may be, would not come within the purposes of a trust which was formed to aid a particular method of education called "progressive education," such as Dr. Dewey taught or encouraged in a book written by him on the subject. The expenditure of this money for the assistance of public schools generally rather indicates to us that the deposits in question were not intended to be a trust fund, but were intended to remain the property of Mrs. Coleman for her to expend from time to time in such manner as her charitable inclinations might direct.

Mrs. Coleman died on December 11, 1924. A Mrs. Harriet Park Thomas lived with her the last five or six weeks of her life. On one occasion Mrs. Coleman asked her to read one of the deeds of trust. After Mrs. Thomas read it Mrs. Coleman asked her, "What do you think of it?" Mrs. Thomas: "I think it is far too valuable an enterprise to be abandoned." "It is not abandoned," answered Mrs. Coleman. "It is in existence today as an educational trust and is being administered according to this trust deed." This is relied upon by the respondent as evidence supporting the theory of a trust. It need

hardly be said that this statement, made in November or December of .1924, did not operate to create a trust if none had been created in March and April, 1923. Under the circumstances already recited, it cannot of itself indicate that the purpose of Mrs. Coleman in March and April, 1923, in opening the accounts, was to thereby create a trust. The statement itself, as made to Mrs. Thomas, was inaccurate. The funds had not been administered according to the deed of trust; they had been administered in part, as above indicated, for purposes inconsistent with the theory of a trust; and there was no requirement that the deposits in these two accounts should be administered according to the deed of trust.

There can be no doubt that Mrs. Coleman was charitably inclined and that it gave her great pleasure to use freely of her means to aid the particular kind of education which she favored, to-wit, "progressive education," as well as to aid education generally and other established charities; but we cannot find from the evidence that in opening or maintaining the two accounts under consideration she intended to thereby create a trust which, until revoked by her, would tie her hands to however slight an extent so that she would not have the utmost freedom of action in dispensing her charities. On the contrary, in spite of her use of the words "foundation" and "trustee" or "trustees," we believe that she regarded these two accounts just as she would have regarded two accounts similarly styled in her own account books kept in her safe at home or in her office,—something which she could do and undo entirely at her pleasure.

Another question raised by the appeal relates to the amount of the fee allowed the master. At the commencement of the trial the presiding judge made an order appointing a master and referring to him the issues of fact that were presented by the petition and the answer.

210

The order was that "an accounting be taken by the said * * * master of and concerning all moneys, stocks, bonds and things of value, if any, belonging to the said Harriet Castle Coleman and at the time of her death in possession of the respondent and of all trust property and moneys, if any, committed by the said Harriet Castle Coleman to the charge of the respondent." The master held hearings, testimony was adduced and many exhibits consisting of books of account and other memoranda were filed before him. He filed a report and a supplementary report. While at the inception of the case there was controversy between the parties on many subjects, one only of these questions was presented to the trial judge upon exceptions to the master's report and that was the question above considered as to the existence of a trust.

At a hearing before the circuit judge one witness, an accountant, testified that in his opinion the services rendered by the master merited compensation in an amount from $3000 to $3600. One of the attorneys for the respondent gave testimony that in his opinion the services were worth from $1500 to $2500. The master gave testimony in detail concerning the nature and the extent of the services rendered and suggested a fee of $1500. The circuit judge fixed the amount of the fee at $800. Upon consideration of all of the circumstances to which our attention has been called by counsel we find no sufficient reason for disturbing the award of the trial judge.

The decree declaring a trust is set aside. A decree in conformity with the foregoing views will be signed upon presentation.

*Marguerite K. Ashford* (*Thompson, Beebe & Winn* on the briefs) for petitioner.

*W. L. Stanley* (*Smith, Warren, Stanley & Vitousek* on the brief) for respondent.

DISSENTING OPINION OF BANKS, J.

I am unable to agree with the majority of the court that there was no declaration of a trust by Mrs. Harriet Castle Coleman.

It must be kept in mind that the question is whether a charitable trust and not a private trust was created. It is necessary to do this for the reason that courts are more prone to uphold donations to charities which are public in their nature than to uphold those that are merely of a private character. It is said in 11 C. J. 307, § 12B: "Charitable trusts are the favorites of equity; they are construed as valid wherever possible, by applying the most liberal rules of which the nature of the case admits, and are often upheld where private trusts would fail. In consequence of such favor, gifts of this character are sustained, although vaguely expressed * * * ." It was held in *Quimby* v. *Quimby,* 175 Ill. App. 367: "Gifts to charity are especially favored in law, and courts will be keen-sighted to discover an intention to make a gift to charity." In *Harrington* v. *Pier,* 105 Wis. 485, 503, the court said: "Courts here, as anciently, look with favor upon all donations to charitable uses and give effect to them where it is possible to do so consistent with rules of law, and to that end the most liberal rules the nature of the case will admit of, within the limits of ordinary chancery jurisdiction, will be resorted to if necessary."

The first indication we find in the record of Harriet Castle Coleman's intention to create a charitable trust is in the trust deed executed in March, 1920, to the Hawaiian Trust Company, Limited. The properties conveyed by this deed were certain Liberty Loan Bonds and Victory Loan Bonds of the total par value of $33,000 and were designated, in memory of her deceased brother and niece, the "Henry and Dorothy Foundation." The trustee was empowered to collect the income from these bonds and to apply it, under the direction of the trustor

or under the direction of Mary Ermine Cross, primarily "for the support and maintenance of the family school at Castle Home, 'Puuhonua,' in Manoa Valley, Honolulu, aforesaid, now being conducted in accordance with and based upon the educational ideas and their legitimate outcome advocated by John Dewey, as indicated in such books as 'Democracy and Education,' by John Dewey, and other similar books." An alternative application (also educational in character) of the income was directed to be made in case the school mentioned should not continue to exist, or in case it did not require the whole of the income. This deed of trust contained a clause reserving to the trustor the right of revocation. This right was exercised, the trust was revoked and the fund was thereupon returned to Mrs. Coleman free from the trust. In June, 1922, Mrs. Coleman executed another trust deed to the Hawaiian Trust Company, by which she conveyed to the trustee certain Liberty Loan Bonds, the aggregate par value of which was $25,000, and which were likewise designated as the "Henry and Dorothy Foundation." The terms of this trust were identical with those contained in the first trust deed. This trust was likewise revoked and the bonds were restored to the trustor free from the trust.

The testimony of Mrs. Harriet Park Thomas, who was called as a witness, shows that the motive which prompted Mrs. Coleman to revoke the deed of trust was not an intention to abandon her charitable purpose but to avoid the unnecessary expenditure of money in connection with it. Mrs. Thomas, who was with Mrs. Coleman during the last few weeks prior to her death, testified that Mrs. Coleman said to her that "there was no use paying the Hawaiian Trust Company to clip the coupons and deposit the money for her. She and Miss Cross could do it themselves."

There is evidence which strongly tends to show that

after the termination of the trust created by the deed of June 21, 1922, Mrs. Coleman had it in mind to make some provision for charities which she considered to be within the scope of the Henry and Dorothy Foundation. On December 21, 1922, she wrote the following letter to her brother-in-law, Professor George Mead, of Chicago:

"My dear George Mead—

"What now! do you say? Well—I have come to the definite conclusion, considering all the personalities I have to deal with—that if I have any money to spend I would better spend it while I am alive—and so I am breaking up this Foundation—of which you may or may not be cognizant—and am going to distribute it now— I am sending you this portion of it for safe keeping if you will be so kind to add this to your many kind offices on my behalf—You will see by the terms of the enclosed duplicate of the deed now revoked what I had planned to do with it—and I still propose to follow this plan in general—though with principal instead of interest— sooner or later—Please consider its disposal subject to instructions from myself or Ermine Cross—and in the event of our departing before it is distributed—then

"I hereby authorize you—George Mead and Helen K. Mead to dispose of it, interest or principal according to the terms of the deed—but with discretionary power to amend—so long as it is for educational purposes.

"Sincerely—

"Harriet Castle Coleman

"I intend to write more fully of this later."

While it is true that this letter was never sent to Professor Mead, it nevertheless reflects what was in Mrs. Coleman's mind regarding the charitable uses she wished to make of certain of her funds.

There is also in evidence a memorandum which was found among Mrs. Coleman's papers, and which was

enclosed in an envelope bearing the endorsement: "Ermine Cross—or L. T. Peck or Geo. H. Mead, Dec. 1922—Memoranda regarding distribution of H. & D. Foundation Money." The memorandum itself is as follows: "This memoranda is for information, to whom it may concern, about the Henry and Dorothy Foundation—a Trust now revoked and distributed as follows—

"The *first five thousand dollars,* which we call our 'interest money,' is part of a ten thousand dollar Liberty Bond which is in the Ermine Cross deposit box at the Hawaiian Trust Co., Ltd. This is in an envelope addressed· to Mary E. Cross Trustee—and will be used at the discretion of Ermine Cross—for *herself*—or *if she so elects*—to pay the bequests to Y. Kuninobu & Fujita and Tome—as provided in a second codicil to my will—or for anything else she may choose to use it for—

"The *second five thousand dollars*—is already delivered in a five thousand dollar bond—to Eloise Marx and Ethelwyn Castle to be added to their memorial to ·their father—

"The *third five thousand dollars*—is for George and Sophie Cooke—for Hanahauoli—to be used at their discretion—

"This amount is part of the ten thousand dollar bond above mentioned—which is in an envelope addressed to Mary E. Cross Trustee—and filed in the Ermine Cross deposit box at the Haw. Trust Co. Ltd.

"The *fourth and fifth five thousand dollars* is given to George H. Mead Chicago Illinois (with instructions for its use) This is in an envelope addressed to him—in the Ermine Cross deposit box as above.

"None of the above trust money is in any way to be considered as a part of the Estate of Harriet Castle Coleman—

"In witness of this behold the signature of

(Sgd) "Harriet Castle Coleman"

"Witnessed and approved by" (Sgd) "Ermine Cross"

Perhaps the most significant feature of this memorandum is the statement contained in the last clause, in which the money is referred to as *trust money* and the very definite intention of Mrs. Coleman that this money was in no way to be considered as a part of her estate.

It is true, according to the evidence, that all of the money was not expended in conformity with the terms of the memorandum. The "third five thousand dollars" mentioned and the "fourth and fifth five thousand dollars" mentioned were never disposed of as recited in the memorandum. George and Sophie Cooke declined to accept the $5000 intended for them and the $10,000 intended for George H. Mead was never sent to him, both of these donations being later deposited in the bank of Bishop & Company to the account of the Henry and Dorothy Foundation. (This will presently be more specifically referred to.)

On December 23, 1922, four days after the revocation of the second trust deed, Mrs. Coleman made the following memorandum. "There is quite an accumulation of money in the Mary E. Cross Trustee account just now— from one source & another—for one purpose & another— the deposit—for instance on

1922

| | | |
|---|---|---|
| June 28— | 300. | from H. C. C. ac. was for work to be done on the cottage (not yet done) to brace and stiffen against storms— |
| July 7— | 1604.92 | was a bal. on H. & D. Foundation ac—at that date principal & interest after revocation of first deed this will be used for same purposes as terms of Foundation |

216

call for—-even tho—second deed is now revoked—*It* (above sum) can be given to George Mead for this purpose—if not disposed by H. C. C. or E. Cross—

1922

| | | |
|---|---|---|
| July 25 | 4.80 | bal. int. on H. & D. Foundation bond |
| July 21 | 50.23 | Sale of bond & interest H. & D. Foundation ac. |
| Aug 30 | 533.55 | Sale of bond & interest by L. T. Peck H. & D. Foundation ac— *All of the Foundation* ac. money —to go to Geo. Mead for distribution—according to instructions to him, unless hitherto disposed by H. C. C. or E. C. |

| | | |
|---|---|---|
| Oct 13 | 800. | from H. C. C. ac—this is to go to Mr. G. G. Kinney sometime—unless Gurrey pays him himself— Kinney knows about this |

"Part of the above accumulation of money is in the Mary E. Cross Trustee open ac at the Bank of Hawaii —part is in the First American Savings & Trust Co— ac Mary E. Cross Trustee

"Harriet Castle Coleman

"Memoranda—re H & D—Foundation money et al—"

On March 16, 1923, Mrs. Coleman opened a savings account with the bank of Bishop & Company by a deposit of $2000. Additional deposits were made by her from time to time and there were withdrawals from time to time by her. The balance on deposit in this account when the instant suit was brought was $10,207.35. The follow-

ing appears in the pass book issued by the bank to Mrs. Coleman: "Account of Harriet Castle Coleman and/or Ermine Cross Tr's for Henry and Dorothy Foundation." At the top of the page is the following: "Payable to either or survivor." On April 11, 1923, Mrs. Coleman opened a checking account with the bank of Bishop & Company, the original deposit being $2000. Additional deposits in this account were likewise made by her from time to time and there were withdrawals by her from time to time. The balance on deposit in this account when the instant suit was brought was $174.47. The following appears in the pass book issued by the bank: "Deposited with The Bank of Bishop & Co., Ltd. to the credit of Henry and Dorothy Foundation Harriet Castle Coleman and/or Ermine Cross, Trustees."

Apparently at or about the time she opened the accounts just referred to Mrs. Coleman made the following memorandum:

"*Sources* of *this H. & D. F. Acct.*

"From H. C. C. in payment for $5000 Bond owned by Foundation—purchased by H. C. C. for her personal use from the Foundation. Also *coupons* from remaining bonds until same are sold. Proceeds of income & principal to be deposited to accts of H. & D. Foundation.

"Purpose of H. & D. F.

"To aid Progressive Education as long as any money remains and to refund H. C. C. for her personal contribution $9384 to the Progressive Ed. Sch. at Castle Home for years—Sept 1918—Sept 1922."

It is apparent from the evidence to which we have referred that it was Mrs. Coleman's intention to devote a certain portion of her wealth to the cause of education, which is indisputably a charitable purpose. This intention was unmistakably manifested in the first and second deeds of trust to the Hawaiian Trust Company. It is

apparent from her unsent letter to Professor Mead. It is strongly indicated in the memoranda made by her. It is conclusively shown by the inscription on the pass books issued by the bank when the two accounts with that bank were opened.

These deposits, in one instance to the credit of Harriet Castle Coleman and/or Ermine Cross, trustees for the Henry and Dorothy Foundation, and in the other to the credit of the Henry and Dorothy Foundation, Harriet Castle Coleman and/or Ermine Cross, trustees, were a complete transfer of the money from Mrs. Coleman individually to herself and Miss Cross as trustees. By this transfer what up to that time had rested in mere intention became an accomplished fact and constituted a declaration of trust. This declaration of trust was never revoked by Mrs. Coleman. On the contrary it is shown by the testimony of Mrs. Thomas, to whom reference has already been made, that it was Mrs. Coleman's fixed purpose to adhere to it. Mrs. Thomas testified that Mrs. Coleman told her one day while she was in her bedroom that she was going to send for some papers which she "wanted me to read; that I should read it and we would discuss it." One of the papers was the first trust deed, which the witness read. After reading it, Mrs. Coleman asked her what she thought of it, to which Mrs. Thomas replied: "I think it is far too valuable an enterprise to be abandoned." Mrs. Coleman then said: "It is not abandoned. It is in existence to-day as an educational trust and is being administered according to this trust deed. I wanted you to read the trust deed and then we would not waste any time defining it. We can begin to talk about it right away." The witness further testified that Mrs. Coleman told her that she was at that time using the Henry and Dorothy Foundation to pay for some scholarships that she had established in connection with

the Hanahauoli school and that she expected to use the entire amount for progressive education.

While it is true that her choice of the agency through which she wished her intention to be accomplished was for a time uncertain, as, for example, her selection and subsequent abandonment of the Hawaiian Trust Company as trustee and her unfulfilled thought to intrust the administration of the fund to her relative, Professor Mead, and while it is also true that her intention regarding the amount she wished to donate was changed, her purpose to devote a part of her wealth to a specific charitable cause, in which she was deeply interested, remained steadfast to the end. If the formula under which the money was deposited in the bank of Bishop & Company did not indicate her fixed and final determination to transfer the amount originally deposited and all other amounts that might be subsequently deposited, from herself individually to herself and Miss Cross as trustees and thereby create a trust fund to be used under the stewardship of herself and/or Ermine Cross for the benefit of the Henry and Dorothy Foundation, it meant nothing. What motive could have prompted her to make these deposits in a form that indicated a purpose she did not have? The evidence discloses none.

In *Martin* v. *Funk,* 75 N. Y. 134, 136, the court said: "The facts in this case are substantially undisputed, as found by the judge before whom the case was tried. The intestate Mrs. Boone, in 1866, deposited in the Citizens' Savings Bank $500, declaring at the time that she wanted the account to be in trust for Lillie Willard, who is the plaintiff. The account was so entered, and a pass-book delivered to the intestate, which contained these entries: 'The Citizens' Savings Bank in account with Susan Boone, in trust for Lillie Willard. 1866, March 23. $500.' A deposit of the same amount, and in the same manner,

was made in trust for Kate Willard now Mrs. Brown. This money belonged to the intestate at the time of the deposits. The plaintiff and Mrs. Brown are sisters, and were at the time, of the age respectively of eighteen and twenty, and were distant relatives of the intestate, their mother being a second cousin. The intestate retained possession of the pass-books until her death in 1875, and the plaintiff and her sister were ignorant of the deposits until after that event. The money remained in the bank with its accumulated interest until the death of the intestate except that she drew out one year's interest. Mrs. Brown assigned to the plaintiff her interest in the deposit purporting to have been made for her benefit, and the action is brought against the administrator of the intestate and the bank for the delivery of the pass-books and the recovery of the money. The question involved has been very much litigated, and many refinements may be found in the books in respect to it. Many cases have been found difficult of solution, not so much on account of the general principles which should govern, as in applying those principles to a particular state of facts. It is clear that a person *sui juris,* acting freely and with full knowledge, has the power to make a voluntary gift of the whole or any part of his property, while it is well settled that a mere intention, whether expressed or not, is not sufficient, and a voluntary promise to make a gift is *nudum pactum,* and of no binding force. (*Kekewich* v. *Manning,* 50 Eng. Ch. 175, and cases cited.) The act constituting the transfer must be consummated, and not remain incomplete, or rest in mere intention, and this is the rule whether the gift is by delivery only, or by the creation of a trust in a third person, or in creating the donor himself a trustee. Enough must be done to pass the title, although when a trust is declared, whether in a third person or the donor, it is not essential that the property

should be actually possessed by the *cestui que trust,* nor is it even essential that the latter should be informed of the trust." The court then reviews many supporting authorities, and says (141, 142) : "Let us now consider the case in hand. In form at least the title to the money was changed from the intestate individually, to her as trustee. She stated to the bank that she desired the money to be thus deposited. It was so done by her direction, and she took a voucher to herself in trust for the plaintiff. Upon these facts what other intent can be imputed to the intestate than such as her acts and declarations imported, and did they not import a trust? There was no contingency or uncertainty in the circumstances, and I am unable to see wherein it was incomplete. The money was deposited unqualifiedly and absolutely in trust, and the intestate was the trustee. It would scarcely have been stronger, if she had written in the pass-book, 'I hereby declare that I have deposited this money for the benefit of the plaintiff and I hold the same as trustee for her.' This would have been a plain declaration of trust, and accompanied as it was with a formal transfer to herself in the capacity of trustee would have been deemed sufficient under the most rigid rules to be found in any of the authorities. It seems to me that this was the necessary legal intendment of the transaction, and that it was sufficient to pass the title. The retention of the pass-book was not necessarily inconsistent with this construction. She must be deemed to have retained it as trustee. The book was not the property, but only the voucher for the property which after the deposit consisted of the debt against the bank."

In *Brabrook* v. *Boston Five Cents Savings Bank,* 104 Mass. 228, one David Knowles wished to deposit to his credit in the savings bank the sum of $3000. He was informed that under the rules of the bank he could not make

so large a deposit in the name of one person. Thereupon in order to circumvent this rule Knowles made one deposit of $1000 under the following designation: "David Knowles trustee for Eliza Knowles," with the date and amount of deposit. After the death of Knowles Eliza Knowles, who by marriage had become Eliza Brabrook, brought suit against the bank claiming that the money belonged to her as a gift from her father. The question before the court was whether under the circumstances under which the deposit was made her contention should be sustained. In deciding this question against the claimant the court said (p. 232) : "Assuming in this case that the deposit and declaration of trust was a sufficient act of delivery to pass the title, if such were the intent, we think the facts agreed show clearly that such was not the intent of the depositor. On the contrary, it would appear that it was the intention of Knowles to deposit the whole money as his own; and that the form of deposit was adopted for the sole purpose of evading a by-law of the bank and a provision of the statutes, limiting the amount that could be received from any one depositor to one thousand dollars."

There is nothing in the instant case, as there was in the *Brabrook* case, to overcome the inference from the entries in the pass books that in depositing the money in the bank of Bishop & Company Mrs. Coleman intended to and did in fact execute a declaration of trust for the use of the Henry and Dorothy Foundation. But even if these entries were not sufficient and other evidence were required of her intention it is found in abundance in the memoranda and other writings to which I have referred and in the testimony of Mrs. Thomas.

In *Gerrish* v. *New Bedford Institution for Savings,* 128 Mass. 159, the court had before it a case in which a depositor, also in order to evade a similar rule of the

bank, had deposited a portion of his money to his own credit as trustee for certain named persons. These persons, after the death of the depositor, claimed that the money was theirs and after introducing the bank book showing the form of the deposits offered to prove at the trial the declarations of the depositor that the money was intended for them. This offer of proof was denied and the claim of the petitioners was dismissed on the strength of the *Brabrook* case. The supreme court held that it was error to reject this offer of proof and said (p. 164): "Upon all the evidence, including that which was excluded but which should have been admitted, a majority of the court is of opinion that a jury would be justified in finding that the testator had fully constituted himself a trustee for these claimants."

In *Cazallis* v. *Ingraham*, 119 Me. 240, the court said (p. 246): "The mere fact of the entry of a deposit in a bank by one person in trust for another would not effectuate an indisputable gift in the form of an irrevocable trust without limitation or condition, which the beneficiary might terminate at will, and which extrinsic evidence could not control. *Savings Inst.* v. *Hathorn,* supra. The entry on the books is not conclusive. *Bank* v. *Fogg,* 83 Maine, 374. Evidence from another source is admissible to vary the effect of the entry and show the intention of the depositor. *Northrop* v. *Hale,* 72 Maine, 275; *Gower* v. *Keene,* supra. But the deposit of money in a bank by one person in trust for another raises a presumption that a trust was intended, and, when supported by evidence showing a continuing intent, or when not refuted by the showing of a contrary intent, creates a trust which is completed and irrevocable, unless the donor reserved the power of revocation."

In *Re Totten,* 179 N. Y. 112, the court said (p. 125): "After much reflection upon the subject, guided by the

principles established by our former decisions, we announce the following as our conclusion: A deposit by one person of his own money, in his own name as trustee for another, standing alone, does not establish an irrevocable trust during the lifetime of the depositor. It is a tentative trust merely, revocable at will, until the depositor dies or completes the gift in his lifetime by some unequivocal act or declaration, such as delivery of the pass book or notice to the beneficiary. In case the depositor dies before the beneficiary without revocation, or some decisive act or declaration of disaffirmance, the presumption arises that an absolute trust was created as to the balance on hand at the death of the depositor." This case was also reported in 1 Ann. Cas. 900, to which is appended an elaborate note. The annotator says (pp. 904, 905): "The authorities are somewhat at variance as to when a deposit in a savings bank, made by one person to the credit of or in trust for another, amounts to the creation of a trust, enforceable by the beneficiary, but there is no dispute as to the principle that the existence of the trust in every such case is a question of fact involving the intention of the donor and an apt declaration of that intention" (citing cases). "According to some decisions the mere fact, standing alone, that a deposit was made by one person in trust for another creates a presumption that an irrevocable trust was intended, and unexplained is conclusive as establishing such trust as of the time when the deposit was made, thus invalidating any subsequent dealings by the depositor with the funds deposited, except in his capacity as trustee" (citing cases). "The weight of authority, however, appears to be in support of the doctrine of the reported case, that the mere fact of such a deposit, standing alone, does not establish an irrevocable trust during the lifetime of the depositor, but a tentative trust merely,

which is revocable at the will of the depositor until he dies or completes the gift in his lifetime by some unequivocal act or declaration showing that the creation of a trust was intended. Such is the rule laid down in the following cases:" (citing cases from Massachusetts, New Hampshire, New York and Rhode Island).

Whether the trust declared by the formula under which the deposits in the bank of Bishop & Company were made constituted an irrevocable trust or a merely tentative one I think is immaterial in this case for the reason that if it was irrevocable it was beyond the power of the trustor to revoke it and if it was tentative it was binding until revoked. As I view the evidence it remained unrevoked at the time of Mrs. Coleman's death. Certainly it was never expressly revoked nor do I think a revocation is implied by her dealings with the money which she deposited.

It is agreed that Mrs. Coleman during her life withdrew from the deposits she had made in the two accounts referred to the total sum of $5742.14. It is disclosed by the evidence that her expenditure of a portion of the money was for purposes relating to education. For instance, she expended some of it for scholarships in Hanahauoli school, an educational enterprise in Honolulu that was under the direction of two of her relatives. Other portions she expended for the employment of an assistant in a kindergarten school in Honolulu. Another portion she expended for nutrition work in one of the Honolulu schools. She expended $200 for the traveling expenses of Miss Lutkins, who was a teacher in Honolulu. She also expended $150 for Miss Lutkins' summer salary. The remaining portion of the money she used to replace an expenditure she had previously made out of her own funds for educational purposes.

When it is considered that the question here for

decision relates to a charitable trust which should be sustained unless inconsistent with the broad equitable principles upon which such trusts are determined I think it places too great a strain on the disposition that Mrs. Coleman made of the money she withdrew to require it to support the conclusion that she either never intended to create a trust or that if she did create one she intended to revoke it. To my mind the uses she made of this money are not inconsistent with a declaration of trust nor are they sufficient to constitute a revocation of the trust. On the contrary I think they are confirmatory of an intention to dedicate the fund which she deposited to the charity which she designated as the Henry and Dorothy Foundation and that they are entirely consistent with the thought that she intended the trust to remain undisturbed. Not a penny of the money which she withdrew was used for her own personal requirements unless it can be said that that portion which she used to replace what she had expended out of her personal funds for an educational purpose was so expended. I believe that this latter use of the money indicates nothing more than a desire on the part of Mrs. Coleman to keep the amount of her donation within certain bounds. It seems to me that having already made expenditures for the support of the very charity for the benefit of which the deposits in the bank were made her use of the money which she withdrew to reimburse herself was not discordant with an intention to create a trust nor did it necessarily imply an intention to revoke the trust already created. But even if she had used all the money which she withdrew for her own personal purposes or for other purposes of a purely private nature it would not have been fatal to the trust. If the trust was irrevocable such use of the money might be a misapplication of trust funds but would have no effect upon the trust itself. If, on the other hand, the

trust was tentative, such use of the money would be nothing more than a partial revocation of the trust and would leave the money remaining on deposit at the time of Mrs. Coleman's death unaffected. See *Re Totten, supra.* In 1 Perry on Trusts 137, § 104, the author says: "Although the power of revocation is reserved the trust is as good and effectual as if irrevocable until the power is exercised."

Believing as I do that the decree appealed from should be affirmed it is necessary, in order to justify my conclusion, that I discuss another phase of the case upon which no opinion is expressed by the majority of the court. The question is whether the designation of the beneficiary is sufficiently definite to meet the legal requirements of a valid and enforceable trust. It is conceded, I believe, that the Henry and Dorothy Foundation was merely the name given by Mrs. Coleman to Progressive Education. It is contended, however, by Mr. Castle, the executor, that even so the term "Progressive Education" is too vague and indefinite to satisfy the requirements of the law relating to charitable trusts. With this contention I cannot agree.

In *Baptist Association* v. *Hart's Executors,* 17 U. S. (4 Wheat.) 1, the court had before it the last will of Silas Hart, a resident of Virginia. By his will Hart made the following bequest: "Item, what shall remain of my military certificates, at the time of my decease, both principal and interest, I give and bequeath to the Baptist Association that, for ordinary, meets at Philadelphia, annually, which I allow to be a perpetual fund for the education of youths of the Baptist denomination, who shall appear promising for the ministry, always giving a preference to the descendants of my father's family." After Hart's death the executors refused to pay the legacy and the Baptist Association, which had become incorpo-

228

rated under the name of the Trustees of the Philadelphia Baptist Association, together with the individuals who were members of the association at the death of the testator, brought suit in the circuit court for the district of Virginia. The judges of that court were divided in opinion on the question whether the plaintiffs were capable of taking under the will and certified the question to the Supreme Court. The opinion of the court was written by Chief Justice Marshall. The conclusion reached was that the bequest could not be sustained. In a very lengthy and learned opinion it was held that courts of chancery, independently of the statute of Elizabeth, had no power to enforce charitable gifts where the charity was of an indefinite nature. The legislature of Virginia having repealed all English statutes, including that of Elizabeth, the question certified was answered in the negative. The conclusion of the court was epitomized in the following sentence (p. 22) : "We find no *dictum* that charities could be established on such information" (by the attorney general) "where the conveyance was defective, or the donation was so vaguely expressed, that the donee, if not a charity, would be incapable of taking." Mr. Justice Story, in a separate opinion, says (p. 33) : "Upon the whole, it seems to me, that the jurisdiction of the court of chancery over charities, where a trust is interposed, or there is no person *in esse* capable of taking, or where the charity is of an indefinite nature, is not to be referred to the general jurisdiction of that court, but sprung up, after the statute of Elizabeth, and rests mainly on its provisions." In the later case of *Vidal* v. *Girard's Executors*, 43 U. S. (2 How.) 126, the court again had this question before it and *Baptist Association* v. *Hart's Executors, supra,* was relied on as conclusive authority. Mr. Justice Story delivered the opinion of the court. The question that was decided in the *Baptist Association* case

was reexamined with the result that the rule announced in the former case was repudiated. Speaking of many English cases which had been examined the court said (p. 196): "They establish in the most satisfactory and conclusive manner that cases of charities where there were trustees appointed for general and indefinite charities, as well as for specific charities, were familiarly known to, and acted upon, and enforced in the Court of Chancery. In some of these cases the charities were not only of an uncertain and indefinite nature, but, as far as we can gather from the imperfect statement in the printed records, they were also cases where there were either no trustees appointed, or the trustees were not competent to take. These records, therefore, do in a remarkable manner, confirm the opinions of Sir Joseph Jekyll, Lord Northington, Lord Chief Justice Wilmot, Lord Redesdale, and Lord Chancellor Sugden. Whatever doubts, therefore, might properly be entertained upon the subject when the case of the *Trustees of the Philadelphia Baptist Association* v. *Hart's Executors,* 4 Wheat., 1, was before this court (1819), those doubts are entirely removed by the late and more satisfactory sources of information to which we have alluded." This view of the law has ever since been adhered to by federal courts. *Perin* v. *Carey,* 65 U. S. (24 How.) 465; *Kain* v. *Gibboney,* 101 U. S. 362.

In the *Kain* case the court, while recognizing that the conclusion reached in the *Baptist Association* case regarding the jurisdiction of courts of chancery over charitable trusts was erroneous, nevertheless felt bound to condemn the bequest contained in the will it had under consideration because it was a Virginia gift by a Virginia will and in that State charities in general were not upheld to any greater extent than ordinary trusts were. The bequest that was sought to be enforced in that case

was to a religious community attached to the Roman Catholic Church, known as the "Sisters of St. Joseph." The court said (p. 365) : "That" (Sisters of St. Joseph) "is an unincorporated association, and it is the association as such, and not the individual members who composed it, when the testatrix died, which is declared to be the beneficiary. Nor is it the community attached to any local church which is designated, but a community attached to the Roman Catholic Church, wherever that church may exist. Its members must be constantly changing, and it must always be uncertain who may be its members at any given time. No member can ever claim any individual benefit from the bequest, or assert that she is a *cestui que trust;* and the community having no legal existence, can never have a standing in court to call the trustees to account. This bequest is, therefore, plainly invalid, unless it can be supported as a charity. And it is far from evident that it is a gift for charitable uses. It looks more like private bounty. Charity is generally defined as a gift for a public use. Such is its legal meaning. Here the beneficial interest is given to a religious community, but not declared to be for religious uses. There is nothing in the will to show that aid to the poor, or aid to learning, or aid to religion, or to any humane object was intended." The court then proceeded to discuss the question on the assumption that the bequest was a charitable one and refused to enforce it on the authority of *Gallego's Executors* v. *The Attorney General,* 3 Leigh (Va.) 450, and other Virginia cases, which held that the courts of chancery have no jurisdiction to uphold charities when the objects are indefinite and uncertain. The court also said, at the very beginning of its opinion (p. 364) : "It may be conceded that, notwithstanding its uncertainty, a legacy given in the words of this will, if for a charity, would be held valid in England, and in most

of the States of the Union."

In the *Vidal* case, *supra,* Stephen Girard, the testator, made a large bequest for the erection and maintenance of a college in the city of Philadelphia. The persons who were to receive the benefits of the institution were declared to be "poor white male orphans between the ages of six and ten years." It was contended by Mr. Girard's heirs at law, who were opposing the bequest, that the objects of the charity were so indefinite and uncertain as to prevent the enforcement of the trust by a court of equity. This contention was not sustained and the bequest was held to be in all respects valid.

The designation of the objects of the charity was no more definite in the Girard will than it was in the will that was before the court in the *Kain* case. But in the *Vidal* case there was no such restraint upon the court as there was in the *Kain* case and the court was free to sustain the bequest upon the broad and humane principles of the common law.

In the *Gallego* case, which the court in the *Kain* case felt obliged to follow, pecuniary legacies of $4000 were given to the Roman Catholic congregation, but for the building and support of a chapel, and the ground was given to trustees to permit the Roman Catholics to build a church for the use of themselves and all persons of that religion residing in Richmond. The court, in discussing this phase of the case, said (p. 461) : "The bare statement seems sufficient to shew, that under the general rule, as applicable to ordinary legacies, these would be void. Who are the beneficiaries? the Roman Catholic congregation residing in Richmond. And who are they? Suppose you name them today: are those the same persons who constituted the congregation yesterday? Or who will constitute it tomorrow? Will none remove from, or come to Richmond to reside? Will none be converted to or

from the Roman Catholic religion? For it is to the Roman Catholic congregation for the time being, that the legacies are given. This, however, is a point which need not be pressed; for it was not pretended that they could be supported, as legacies to individual persons."

In 1885, some years after the *Gallego* case was decided, the law as there laid down was overturned by the court that had established it and the principles that were applied to charitable bequests in the *Vidal* case were adopted.

In *Protestant Episcopal Education Society* v. *Churchman's Representatives*, 80 Va. 718, the law of Virginia regarding charitable trusts, as it theretofore existed, was exhaustively reviewed. The authorities upon which it was based were re-examined and as a result the court frankly confessed that the rule announced in the *Vidal* case was the correct one. The court there had before it the following bequest made by Dr. Churchman: "At the death of said Alice Clark Churchman, whenever that may be, the principal sum of $4,000, and any unexpended interest, shall be paid to the Trustees of The Protestant Episcopal Education Society of Virginia,—the said bequest to be used exclusively for educating poor young men for the Episcopal ministry, upon the basis of evangelical principles as now established." The circuit court, before which the matter was first heard, entered a decree declaring that this bequest was invalid, one of the reasons assigned being that it was "too vague and indefinite to be upheld under the law of this State, or to be administered by a court of chancery." In reversing this decree the supreme court said (p. 783): "In any view, and according to the plain letter of the law, the bequests in this case are in every respect as definitely and clearly stated as it is possible to describe a charity for such a use. This being so, it necessarily follows that the second proposition announced in the decree, that these bequests

are null and void because too vague and indefinite to be upheld under the law of this State, or to be administered by a court of equity, is palpably erroneous and must be rejected. In arriving at our conclusion, we have not been unmindful of the great public importance of the question we have been dealing with. At the same time we have kept in view the fact that it is the natural right of every man, recognized in every country where an enlightened system of jurisprudence prevails, a right guaranteed by our constitution and laws, to acquire, use and enjoy property, with the right to dispose thereof according to his own will and pleasure, and this without any limitation except that a man shall not use his own to the detriment of others. Keeping in view at the same time our duty to give effect to the will of the testator, if possible, and seeing clearly that under the law we can do so, we have the consoling reflection, that in performing that duty, effect is given to a noble act of Christian benevolence and charity."

There can be no doubt that if, when the *Baptist Association,* the *Kain* and the *Gallego* cases were decided, the law in Virginia had been what it was later declared to be the fate of the bequests in those cases would have been quite different.

There are a few jurisdictions in which the old Virginia rule is still adhered to. In some of these it is imposed by legislative enactments and in others it is fixed by judicial dogma. In these latter jurisdictions the reason given is that the court has no means of control over the trustee when there is no *cestui* who has such an interest that he can come into court and compel the trustee to execute the trust. It is said in 2 Perry on Trusts 1204 (§ 713, n.) : "The great majority of American courts have adopted a much more liberal rule in regard to gifts or bequests for charitable purposes, finding inherent in

courts of equity ample judicial power to enforce and provide for the proper execution of such trusts, if the donor or testator has provided some method or means of selecting the ultimate beneficiaries. It is not considered necessary that the class to be benefited shall be so clearly defined or the members so definitely pointed out that any of them shall be able to go into court and compel the execution of the trust for his benefit. Although the courts are not in full accord as to the extent to which they can properly go when the donor has not provided some method by which the ultimate objects of the gift may be determined, probably all American courts, except a few which take the extreme view adopted in Maryland, agree that where the donor or testator has designated a class by naming the kind of charity, as distinguished from charity in general, and also has given to a competent trustee the power to select the individuals from the designated class, the trust is valid."

In *Harrington* v. *Pier, supra,* the court, in addition to what I have already quoted, said (p. 504) : "It is sufficient if there be a trust and a particular charitable purpose, as distinguished from a gift to charity generally. The court may supply the trustee to administer the trust; the trustee may select the beneficiaries from within the general class named by the donor, and when necessary may work out the details of the declared purpose within its stated general limits. Certainty of beneficiaries who can invoke judicial power to enforce the trust is not only unnecessary, but is inconsistent with the very nature of a trust for charitable uses, in that the beneficiaries, in a general sense, are the members of the public at large. A public charity, within the rule mentioned, is sufficiently definite as to purpose if its general nature be clearly stated, or it can be made otherwise certain by the trustees clothed with the power of administering the trust within

the limits of the declared purpose. It is sufficiently definite as to immediate beneficiaries, by the power of selection lodged expressly or impliedly in the trustee appointed by the donor, or by the court where there is a trust but no trustee. If the trustee abuse his power, there is a complete remedy by the exercise of the visitorial power of the state." And also said (p. 514): "Given a trust, with or without a trustee, a particular purpose—as education, or relief of the poor, as distinguished from a bequest to charity generally—and a class great or small, and without regard to location, necessarily, as 'worthy indigent females,' or 'indigent young men studying for the ministry,' or 'resident poor,' or 'indigent children of Rock county,' or 'the boys and girls of California' (*People ex rel Ellert* v. *Cogswell*, 113 Cal. 129), and we have a good trust for charitable uses. The court, through its strictly judicial power, may fill the office of trustee if necessary, the trustee can select the immediate beneficiaries or objects within the designated class and scheme; he can determine upon the details necessary to effect the intention of the donor within the general limits of his declared purpose, and execute the trust accordingly; and the proper public agencies, if necessary, can invoke judicial power to enforce such execution." The question in regard to which these observations were made is indicated in the first sentence in the opinion, where the court said: "The vital question presented for adjudication in this appeal is, Is the bequest to trustees to promote temperance work in the city of Milwaukee void for uncertainty?" The question was answered in the negative.

In *Vineland Trust Co.* v. *Westendorf*, 86 N. J. Eq. 343, the court had before it the following bequest: "On the decease of the said Eliza Freeman Spencer, I further give, devise and bequeath all my estate, as it shall then stand, to Mrs. Katharine Westendorf, of Denver, Arapa-

hoe County, State of Colorado, teacher of vocal expression and oratory, and to her friend, Mrs. Helen Campbell, author, to be used jointly by them in the furtherance of the broadest interpretation of metaphysical thought, in whatsoever manner and by whatsoever means they may jointly consider proper and best, authorizing them to sell and convey any and all real estate and use the proceeds thereof for the above purposes." One of the questions presented was whether the bequest was void for uncertainty. On this subject the court said: "The fund is to be used for the teaching of metaphysics—the science of being—the science which deals with ultimate reality; the philosophy of mind; the science beyond experience; the realm of transcendental rumination and of speculation of the philosophers. The subject is purely and essentially educational. It is a course of study in our colleges and universities, and the trust is, in every sense, a legal charity. The infinitude of the subject, and, consequently, the great latitude given to the trustees in executing the trust, creates no legal infirmity. The field of contemplative research is well defined, and whether the investigation is to be pursued on the lines of materialism, idealism or realism, and whether according to the conception of the ancient philosophers, or of the more recent Kant, Wolf, or of Herbert Spencer, or within the narrower sphere of spiritualism or of Christian Science, was left to the judgment of the trustees. There is no uncertainty as to the objects of the bounty. All mankind may share in its benefits. The charity is general, with power in the trustees to make it definite. Such charities have been uniformly upheld, as for instance, for the tuition of poor children in the elements of English literature (*McBride* v. *Elmer, 6 N. J. Eq. 107*); to promote the religious interests and to aid missionary, educational and benevolent enterprises of a church (*DeCamp* v. *Dobbins, 29 N. J. Eq. 36;* af-

*firmed, 31 N. J. Eq. 671*); for the most deserving poor of the city of Paterson (*Hesketh* v. *Murphy, 35 N. J. Eq. 23; affirmed, 36 N. J. Eq. 304;* for the purpose of spreading the light on social and political liberty and justice in these United States of America (*George* v. *Braddock, 45 N. J. Eq. 757*); for the purchase of books upon the philosophy of spiritualism (*Jones* v. *Watford, 62 N. J. Eq. 339; affirmed,* on this phase, *64 N. J. Eq. 785*). In *Glover* v. *Baker, 76 N. H. 393,* and in *Chase* v. *Dickey, 212 Mass. 555; 99 N. E. Rep. 410,* the courts held that the will of Mary Baker Eddy, which gave the residue of her estate in trust, to be in part devoted and used for the purpose of more effectually promoting and extending the religion of Christian Science as taught by her, created a charitable trust and was not invalid for indefiniteness or ambiguity."

In *Chambers* v. *City of St. Louis,* 29 Mo. 543, 572, the court had under consideration the following bequest: "I, Bryan Mullanphy, do make and declare the following to be my last will and testament: One equal undivided third of all my property, real, personal and mixed, I leave to the City of St. Louis, in the State of Missouri, in trust, to be and constitute a fund to furnish relief to all poor emigrants and travelers coming to St. Louis on their way, *bona fide,* to settle in the west." The testator's heirs attacked the bequest on the ground among others that those who were to be benefited by it were not sufficiently certain. Speaking on this point the court said (p. 589) : "The only remaining question to be considered is whether the trust of this will can be enforced on account of the uncertainty of those who are to be benefited by it. The case, as we view it, shows that there is a valid devise to a trustee capable of taking the subject of the devise and competent to undertake and execute the trust with which the devise is clothed. As the general object of the

charity was specific and certain, and not contrary to any positive rule of law, with a competent trustee to execute the charity designated, we do not see on what ground this objection can rest. If, under such circumstances, the uncertainty of the persons to be relieved by a charitable fund could be available to destroy it, few charities could be sustained. If all the recipients of a charity could be designated with certainty at the time of its creation, there would be no necessity for a law for charitable uses different from that which governs all other trusts. The only difficulty in the way would be the law against perpetuities, and that would not exist where the donation in trust was made to a corporation. From the very nature of the subject, charitable gifts must be objects vague and uncertain. The subjects of the charity may be numerous, and they are to be sought for and ascertained by those to whose discretion and judgment the dispensation of the relief is entrusted. The founder of a charity, by placing his fund in the hand of a competent trustee, designating the general object of the trust, with power to carry that object into effect, makes the trustee his substitute or delegate. Can not any individual, who has the means, employ them for the relief of 'poor emigrants and travelers coming to St. Louis on their way to settle in the west?' If he can carry out this charity himself, may he not appoint another to do it for him? Could it be objected to such a course that the trustee would not know how to act? As the donor of the bounty is willing to confide its management to the discretion of his agent, so long as that agent acts in good faith his acts are the acts of his principal, and there is no one but the principal to complain. If the agent abuses his trust, he, like all other fiduciary agents, is subject to the control of the courts. But the answer to the objection of uncertainty is, that by the law, as it stood unaffected by the statute, courts of

equity, by virtue of their inherent powers, would execute such trusts and carry them into effect. In the case of *Mogridge* v. *Thackwell*, 7 Ves. 86, it was held by Lord Eldon that where there is a general indefinite purpose, not fixing itself upon any object, the disposition is in the king by sign manual; but where the execution is to be by a trustee, with general or some objects pointed out, there the court will take the administration of the trust."

In *Irwin* v. *Swinney*, 44 F. (2d) 172, the court, in commenting on the language above quoted, said (p. 178): "I conceive that the principle announced by the supreme court of Missouri in this decision is this: That mere indefiniteness as to the recipient of the bounty to be dispensed under a charitable trust in no way affects its validity so long as there is a trustee empowered to select the recipients, provided general objects are sufficiently described that a court of equity may restrain the trustee from a misuse or abuse of the funds committed to his administration. There is sufficient definiteness when the general objects of the testator's bounty are pointed out. The reasons for such a requirement as to definiteness, as they are suggested in this opinion of the supreme court, are two, and I have found none other in any decision where charitable trusts are recognized, and I can conceive of no other. They are these: First, if the language creating the trust is not sufficiently definite to indicate that it is to be for charitable purposes, then it cannot be held to be a charitable trust at all and is subject to the laws governing private trusts; second, if the language creating the trust is not sufficiently definite as to the limits placed upon the discretion of the trustee as to enable a court of equity to restrain him within those limits, then his control over the property committed to his care is equivalent to that of a private owner." The court went on to say that the law declared in the *Chambers* case "has never been

departed from in the judicial history of Missouri so far as the principles therein embodied are concerned, but has, on the other hand, often been reasserted."

The trust in the instant case has all the elements requisite to its validity as a charitable gift. The purpose of the trust is to aid Progressive Education, which is undoubtedly a charitable object. The recipients of the bounty are indefinite but trustees are named with the implied power to select the recipients within the designated charity. One of these trustees is living, who is competent and willing to act. That the trustees named by Mrs. Coleman had the implied power to select the objects of the charity I think, upon principle, cannot be doubted. In *Hesketh* v. *Murphy,* 36 N. J. Eq. 304, the court said (p. 310) : "The present case does not call for any opinion on the important question how far, in the application of simply judicial standards, the courts of this state would undertake to exercise the doctrine of *cy pres* by construction; the subject is referred to only for the purpose of exemplifying with what strength of favor charitable bequests are regarded by the courts. But without resorting to a method of interpretation which, until it has received the sanction of the courts of this state, must be considered as of questionable validity, and following none but the ordinary guides in the construction of wills, I cannot doubt that the inevitable conclusion must be that the testamentary disposition in the case cited from the Connecticut reports, as well as the one now under consideration in this court, confers upon the trustees not only the power to distribute the funds confided to them, but, as a necessary incident to that function, also the right to select the beneficiaries. It is the ordinary doctrine that when an act is authorized to be done by a trustee or other agent, every authority requisite to the doing of such act is, by intendment of law, com-

prised in such grant of power. A common example of this rule is presented in cases in which a power of sale is given by a will without in terms specifying by whom it is to be exercised, but if the proceeds of the sale are directed to be distributed by an executor or trustee, in such instances it has been held in numerous decisions that such executor or trustee will take, by implication, the power of selling, unless some other intent is discoverable from the whole will. *Newton* v. *Bennet, 1 Bro. C. C. 135; Bentham* v. *Wiltshire, 4 Madd. 44; Blatch* v. *Wilder, 1 Atk. 420.*"

If the surviving trustee in the instant case should misuse the fund or apply it to objects clearly outside the purposes for which it was created, a court of equity, in the exercise of its inherent jurisdiction over charitable trusts, would have the power to correct the abuse and keep the administration of the trust within legitimate bounds.

I concur with the majority of the court regarding the master's fee.